In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3465

Miami Nation of Indians
of Indiana, Inc., et al.,

Plaintiffs-Appellants,

v.

United States Department
of the Interior, et al.,

Defendants-Appellees.

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 92 C 586--Robert L. Miller, Jr., Judge.

Argued May 8, 2001--Decided June 15, 2001


  Before Bauer, Posner, and Coffey, Circuit
Judges.

  Posner, Circuit Judge.  Article I of the
Constitution authorizes Congress to
regulate commerce with Indians. As an
original matter, the power to recognize
an Indian tribe might be thought
quintessentially and exclusively
Presidential, Western Shoshone Business
Council v. Babbitt, 1 F.3d 1052, 1057
(10th Cir. 1993), like the power to
recognize (or not recognize) a foreign
nation, Banco Nacional de Cuba v.
Sabbatino, 376 U.S. 398, 410 (1964)
("political recognition is exclusively a
function of the Executive"); Clark v.
Allen, 331 U.S. 503, 514 (1947); Mingtai
Fire & Marine Ins. Co. v. United Parcel
Service, 177 F.3d 1142, 1145 (9th Cir.
1999), even though Article I also gives
Congress the power to regulate foreign
commerce. But Indian tribes are not
foreign--they are what Chief Justice
Marshall called "domestic dependent
nations," Cherokee Nation v. Georgia, 30
U.S. (5 Pet.) 1, 12 (1831)--and the
general view nowadays, which none of the
parties to this suit has questioned
(though of course a concession on a
jurisdictional issue does not bind us),
is that Congress has the power, both
directly and by delegation to the

President, to establish the criteria for recognizing a tribe. See, e.g., Cherokee Nation of Oklahoma v. Babbitt, 117 F.3d 1489, 1503 (D.C. Cir. 1997); Fletcher v. United States, 116 F.3d 1315, 1333 (10th Cir. 1997); Western Shoshone Business Council v. Babbitt, supra, 1 F.3d at 1056-57. This makes practical sense. Congress has passed a number of statutes granting various benefits and immunities to Indian tribes, provided they are recognized by the federal government. See, e.g., Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. sec. 450b(b); Indian Financing Act of 1974, 25 U.S.C. sec. 1452(c); see Greene v. Babbitt, 64 F.3d 1266, 1269 (9th Cir. 1995). Naturally and legitimately, Congress is concerned which groups of Indians are given the status of tribes. But the analogy to recognition of foreign governments has prevailed to the extent that Congress has delegated to the executive branch the power of recognition of Indian tribes without setting forth any criteria to guide the exercise of that power. See 25 U.S.C. sec.sec. 2, 9.

In 1978, the Department of the Interior promulgated a regulation that sets forth such criteria. A group of Indians that is seeking recognition as a tribe entitled to federal largesse (the regulation calls recognition "acknowledgment" and the terminology may be significant, as we'll see later) has to satisfy seven criteria: (a) the group has been identified from historical times to the present, on a substantially continuous basis, as Indian; (b) "a substantial portion of the . . . group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and . . . its members are descendants of an Indian tribe which historically inhabited a spe cific area"; (c) the group "has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present"; (d) the group has a governing document; (e) the group has lists of members demonstrating their descent from a tribe that existed historically; (f) most of the members are not members of any other Indian tribe; (g) the group's status as a tribe is not precluded by congressional legislation. 25 C.F.R. sec. 83.7. In 1980, the Miami Nation of Indians of Indiana petitioned

Interior for recognition that it was an Indian tribe. (Obviously the fact that it calls itself a "nation" is not dispositive.) Twelve years later, Interior ruled that the Miami had not satisfied criteria (b) and (c) (the ones we quoted rather than paraphrased) of the regulation and therefore would not be recognized. 57 Fed. Reg. 27312 (1992). The Miami Nation sought judicial review in the district court and appeals to us from that court's decision upholding Interior's ruling. 112 F. Supp. 2d 742 (N.D. Ind. 2000). Earlier decisions by the district court in this protracted litigation are cited in the 2000 opinion.

In 1854 the President of the United States had made a treaty (ratified by the Senate) with the "Miami Indians," 10 Stat. 1093, a tribe described in the treaty as consisting of both "Indiana Miamis" and "Western Miamis." Although the matter is not free from doubt, we shall assume that the Miami Nation, though limited to Indiana Miamis, is the tribe referred to in the 1854 treaty; and it is obvious from the treaty that the President recognized the tribe as being, indeed, an Indian tribe. It is equally obvious that Indian nations, like foreign nations, can disappear over time--can go the way of Sumeria, Phoenicia, Burgundy, the Ottoman Empire, Prussia, the Republic of Texas, and the Republic of Vietnam, whether through conquest, or voluntary absorption into a larger entity, or fission, or dissolution, or movement of population.

In the century and a half since President Pierce signed the treaty with the Miami Indians, and especially since 1940, the Miami has dwindled. Today there are only about 4,700 Indiana Miamis, scattered across the nation, with only one-third resident in a more or less contiguous group of five Indiana counties--in which, however, the Miamis, who live dispersed throughout the area rather than in their own separate communities within it, constitute less than one half of one percent of the counties' population. Only about 20 percent of this group socialize with one another. On average only 3.5 percent attend the annual reunion that is the sole organized event of the group. We were told at argument without contradiction that it has been decades

since any member of the Miami Nation sought to avail himself or herself of any of the benefits or immunities that Congress has extended to members of recognized Indian tribes.

There is a tribal council, but it performs no meaningful governance functions. There is scant contact between the council and the rest of Indiana Miamis, and the instances in which the council has tackled important issues, such as cemetery relocation, are few and far between. Since 1940 the council has rarely dealt with the kind of governmental or political issues that agitate tribes, including hunting and fishing rights, disputes between tribal factions, and loss of tribal lands. The council has been more active since 1979, when it bestirred itself to seek federal recognition of the Miami Nation. It now operates a number of programs concerned with welfare (such as day-care programs) and economic development, and it has sought and obtained grants to fund these programs. But such programs, charitable rather than administrative in character, are a far cry from "governance."

The Indiana Miamis have thus failed to satisfy the two quoted criteria in the Department of the Interior's regulation. But they argue that the regulation is invalid because not authorized by Congress. This is clearly incorrect, see 25 U.S.C. sec.sec. 2, 9; James v. HHS, 824 F.2d 1132, 1137 (D.C. Cir. 1987); Western Shoshone Business Council v. Babbitt, supra, 1 F.3d at 1056-57; nor is it clear that it has to be authorized by Congress. Recognition is, as we have pointed out, traditionally an executive function. When done by treaty it requires the Senate's consent, but it never requires legislation, whatever power Congress may have to legislate in the area. What is more, and placing in question whether we are even authorized to review the decision not to recognize the Miami Nation, recognition lies at the heart of the doctrine of "political questions." The doctrine identifies a class of questions that either are not amenable to judicial resolution because the relevant considerations are beyond the courts' capacity to gather and weigh, see, e.g., Nixon v. United States, 506 U.S. 224, 228-29 (1993); Laurence H. Tribe, American Constitutional Law, vol.

1, 365-85 (3d ed. 2000), or have been committed by the Constitution to the exclusive, unreviewable discretion of the executive and/or judicial--the so-called "political"--branches of the federal government. Baker v. Carr, 369 U.S. 186, 217 (1962); Jones v. United States, 137 U.S. 202, 212 (1890); Tucker v. United States Dept. of Commerce, 958 F.2d 1411, 1415 (7th Cir. 1992); Made in the USA Foundation v. United States, 242 F.3d 1300, 1311-14 (11th Cir. 2001); Mingtai Fire & Marine Insurance Co. v. United Parcel Service, supra, 177 F.3d at 1144-45; Gordon v. Texas, 153 F.3d 190, 193 (5th Cir. 1998); cf. Barclays Bank PLC v. Franchise Tax Bd., 512 U.S. 298, 327-28 (1994); Banco Nacional de Cuba v. Sabbatino, supra, 376 U.S. at 410.

The second branch of the doctrine, which is based on the extreme sensitivity of the conduct of foreign affairs, judicial ignorance of those affairs, and the long tradition of regarding their conduct as an executive prerogative because it depends on speed, secrecy, freedom from the constraint of rules--and the unjudicial mindset that goes by the name Realpolitik--is not engaged by a dispute over whether to recognize an Indian tribe. But the first branch, which focuses on the nature of the questions that the court would have to answer--which asks whether the answers would be ones a federal court could give without ceasing to be a court, ones within the cognitive competence, as distinct from the authority, of federal judges--is engaged by such a dispute. Consider the case usually thought to have invented the political-questions doctrine, Luther v. Borden, 48 U.S. (7 How.) 1 (1849). Rather than adopt a new constitution after the break with England, Rhode Island continued to use its colonial charter as its constitution. This action (or rather inaction) was unpopular. Restive citizens convened a constitutional convention not authorized by the charter. The convention adopted a new constitution to which the charter government, however, refused to submit, precipitating rebellion and the establishment in 1841 of a rival state government. The Supreme Court refused to decide which of the two competing state governments was the legitimate one. It would have been very difficult to gather and assess, by the methods of litigation, the facts relevant to such a decision,

and even more difficult to formulate a legal concept of revolutionary legitimacy to guide the decision.

So if the residents of what was once the Kingdom of the Two Sicilies asked a federal court to recognize it as an independent nation, the court would invoke Luther v. Borden and tell them to take up the matter with the State Department. Cf. Clark v. Allen, supra. The question whether the Miami Nation constitutes a "nation" with a "government" with which the United States might establish relations is similar. It comes as no surprise, therefore, that "the action of the federal government in recognizing or failing to recognize a tribe has traditionally been held to be a political one not subject to judicial review." William C. Canby, Jr., American Indian Law in a Nutshell 5 (3d ed. 1998); see United States v. Holliday, 70 U.S. (3 Wall.) 407, 419 (1866); Cherokee Nation of Oklahoma v. Babbitt, supra, 117 F.3d at 1496; Western Shoshone Business Council v. Babbitt, supra, 1 F.3d at 1057; Felix S. Cohen's Handbook of Federal Indian Law 3-4 (Rennard Strickland ed. 1982).

But this conclusion assumes that the executive branch has not sought to canalize the discretion of its subordinate officials by means of regulations that require them to base recognition of Indian tribes on the kinds of determination, legal or factual, that courts routinely make. By promulgating such regulations the executive brings the tribal recognition process within the scope of the Administrative Procedure Act. Cf. Morton v. Ruiz, 415 U.S. 199, 235 (1974); Hein v. Capitan Grande Band of Diegueno Mission Indians, 201 F.3d 1256, 1261 (9th Cir. 2000). And the Act has been interpreted (1) to require agencies, on pain of being found to have acted arbitrarily and capriciously, to comply with their own regulations (whether formal, as here, or common-law-type doctrines) until the regulations are altered by proper procedures, Webster v. Doe, 486 U.S. 592, 602 n. 7 (1988); Service v. Dulles, 354 U.S. 363, 388 (1957); Head Start Family Education Program, Inc. v. Cooperative Educational Service Agency 11, 46 F.3d 629, 633 (7th Cir. 1995); Cherokee Nation of Oklahoma v. Babbitt, supra, 117 F.3d at 1499;

Florida Institute of Technology v. FCC, 952 F.2d 549, 553 (D.C. Cir. 1992); Canby, supra, at 5, and (2) to make compliance with the regulations judicially reviewable, provided there is law to apply to determine compliance, 5 U.S.C. sec. 701(a)(2); Webster v. Doe, supra, 486 U.S. at 599-600; Heckler v. Chaney, 470 U.S. 821, 830 (1985); Sprague v. King, 23 F.3d 185, 188 (7th Cir. 1994)--as there is if despite the lack of statutory criteria, the agency's regulation establishes criteria that are "legal" in the sense not just of being obligatory but of being the kind of criteria that courts are capable of applying. Ellison v. Connor, 153 F.3d 247, 251-52 (5th Cir. 1998); McAlpine v. United States, 112 F.3d 1429, 1433-34 (10th Cir. 1997).

As we explained in NLRB v. Kemmerer Village, Inc., 907 F.2d 661, 663-64 (7th Cir. 1990), with reference to the Labor Board--but the point is equally applicable to the Department of the Interior--"no one questions the validity of the doctrine [i.e., the NLRB's rule that an organization is exempt from the National Labor Relations Act if it is incapable of engaging in meaningful collective bargaining] in this proceeding. The only question is whether the Board misapplied the doctrine in the present case. This is a question for us because the Board is bound by its own rules until it changes them, Continental Web Press, Inc. v. NLRB, 742 F.2d 1087, 1093 (7th Cir. 1984), including the rules that it has adopted in order to channel what would otherwise be an essentially unreviewable discretion in the deployment of its limited prosecutorial resources, State Bank of India v. NLRB, 808 F.2d 526, 537 (7th Cir. 1986)." See also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29 (1983); Aramark Corp. v. NLRB, 179 F.3d 872, 882 (10th Cir. 1999) (en banc). To put it more succinctly, the requirement of reasoned decisionmaking--the requirement that the APA places on agencies and that sets them apart from legislatures-- implies that an agency may not deviate from its regulations without a reason, unlike a legislature, which can repeal a statute without giving a reason for its change of heart. See Continental Web Press, Inc. v. NLRB, supra, 742 F.2d at 1093-94. "A rational person acts

consistently, and therefore changes course only if something has changed." Schurz Communications, Inc. v. FCC, 982 F.2d 1043, 1053 (7th Cir. 1992).

Two exceptions should be noted. First, as the "law to apply" provision of the APA makes clear, the fact that a regulation has been promulgated doesn't automatically make compliance with the regulation a justiciable issue. It depends on what the regulation says; it may not set forth sufficiently "law like" criteria to provide guideposts for a reasoned judicial decision. Second, whatever it says, the regulation will not remove a case from the rule of that branch of the political-questions doctrine that is based not on the analytical or epistemic limitations of courts but on a lack of judicial authority, that is, the assignment of ex clusive decisionmaking responsibility to the nonjudicial branches of the federal government. If in a matter within his exclusive authority the President wants to regularize the exercise of discretion by his subordinates, and to this end promulgates a regulation, the regulation does not empower the courts to jump in and determine compliance with it; the area is out of bounds for the courts. But this case, as we have seen, is not ruled by the second branch of the political-questions doctrine, and so far as the first branch is concerned McAlpine found that another Indian regulation of the Department of the Interior was a law-like and hence justiciable rule; and the existence of such a rule renders inapplicable the only branch of the political-questions doctrine that pertains to the recognition of Indian tribes. Florida v. United States Department of the Interior, 768 F.2d 1248 (11th Cir. 1985), reached a contrary conclusion from McAlpine, but only because it disagreed that the regulation in question was sufficiently directive to count as law. Id. at 1256-57. It did not disagree with the principle that McAlpine expounded and we accept.

The Department of Interior's regulation on recognition, the terms of which we quoted or paraphrased earlier, breaks the recognition issue down into a series of questions that are "legal" in the relevant sense, that is, are the sort of questions that courts are equipped to

answer. The political-questions doctrine is therefore not in play and does not prevent the Miami Nation from arguing that the Department of the Interior committed error in the interpretation or application of the regulation, as by arbitrarily failing to recognize the Miami Nation as a tribe when the anthropologist that the Department itself had retained to conduct a study of the question recommended otherwise. There was no error in the Department's handling of the anthropologist's evidence, however. The Department had not, by its action in hiring an anthropologist to advise it, delegated to her the authority to determine whether the regulatory criteria for recognition had been met. It could not arbitrarily disregard the anthropologist's evidence, and it did not. It reviewed her report and found many errors and unsubstantiated conclusion. And it obtained additional information, after the anthropologist submitted her report, that further undermined the conclusions in it.

The Miami Nation makes the additional argument, however, that the Department used the wrong standard when it refused to recognize the Miami Nation as a tribe, namely the standard applicable to the recognition of a group of Indians that is seeking tribal status for the first time, a group never before recognized as a tribe though it must have been a tribe since "historical times" in order to be eligible for recognition under the regulation. The Miami Nation had been recognized back in 1854--it was not seeking recognition--and so the applicable standard, it argues, is that applicable to the abandonment of tribal status. (Actually, recognition had been withdrawn by the Department of the Interior in 1897--invalidly, the Miami Nation argues. We need not decide the issue; we can ignore the 1897 demarche.)

The Department ignored the distinction between recognition and abandonment. The regulation under which it preceded does not mention "abandonment"; no regulation does, so far as we have been able to discover; and it might seem, therefore, that we are back in the arena of undomesticated discretion where either the political-questions doctrine or the APA's "law to apply" provision bars judicial review. But this is not so, and

for two reasons. First, if the Department mistakenly proceeded under the recognition regulation and as a result did not exercise the discretion that it has to determine abandonment, the remedy is to remand for the exercise of that discretion. See, for example, Chathas v. Local 134 IBEW, 233 F.3d 508, 514 (7th Cir. 2000); Channell v. Citicorp National Services, Inc., 89 F.3d 379, 387 (7th Cir. 1996); Campanella v. Commerce Exchange Bank, 137 F.3d 885, 892 (6th Cir. 1998). As we said in Channell, "Because he held that sec. 1367(a) did not authorize the exercise of supplemental jurisdiction, [the district judge] did not exercise the discretion sec. 1367(c) confers. It belongs to him rather than to us, so we remand for its exercise." 89 F.3d at 387. Failure to exercise discretion, however uncanalized that discretion, is an abuse of discretion.

Second, the regulation does cover abandonment. Just the fact that it uses the term "acknowledgment" rather than "recognition" is suggestive. The original regulation, promulgated in 1978, allowed a group seeking acknowledgment to prove its satisfaction of the criterion of having been known as an Indian tribe since historical times by showing "repeated identification by Federal authorities." 25 C.F.R. sec. 83.7(a)(1). This covers a previously recognized tribe and by doing so implies that a tribe can indeed cease to be recognized by failing to satisfy the regulation's criteria. The regulation was amended in 1994 to require previously recognized tribes to show only that the criteria had been met since the last time the tribe was recognized by the federal government. See 59 Fed. Reg. 9280, 9282 (Feb. 25, 1994). This further weakens the inference that the only basis for withdrawal of recognition and hence for the denial of the benefits and immunities that Congress extends to recognized tribes is "voluntary abandonment" by the tribe.

And what sense would that make? Few nations dissolve or disband voluntarily (Czechoslovakia is perhaps the clearest recent example). It would be preposterous to suppose that because the Republic of Vietnam (i.e., South Vietnam) was conquered rather than voluntarily uniting with the People's Democratic Republic of

Vietnam (North Vietnam), it must still be recognized by the United States. If a nation doesn't exist, it can't be recognized, whether or not it ceased to be a nation voluntarily. Our examples are of foreign nations, but in respect to the irrelevance of the cause of a nation's ceasing to be a nation the analogy of Indian tribes to them is compelling.

Probably by 1940 and certainly by 1992, the Miami Nation had ceased to be a tribe in any reasonable sense. It had no structure. It was a group of people united by nothing more than common descent, with no territory, no significant governance, and only the loosest of social ties. To what extent and in what sense this long-drawn-out process of dissolution of the tribe of 1854 should be called "voluntary" can be debated (there is no contention that it was coerced), but that it amounted to abandonment cannot be doubted. The federal benefits for the sake of which recognition is sought are extended to tribes, not to individuals, so if there is no tribe, for whatever reason, there is nothing to recognize. Greene v. Babbitt, 64 F.3d 1266, 1269 (9th Cir. 1995); Felix S. Cohen's Handbook of Federal Indian Law, supra, at 1. Recognition in such a case would merely confer windfalls on the members of a nonexistent entity.

We are mindful of cases such as Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 586-87 (1st Cir. 1979), which say that "if a group of Indians has a set of legal rights by virtue of its status as a tribe, then it ought not to lose those rights absent a voluntary decision made by the tribe and by its guardian, Congress, on its behalf." But such dicta presuppose that the tribe still exists. If it does, it cannot be divested of the rights that go with tribal status without its consent. But if it no longer exists, it has no rights to be divested of; there are no rights without a rights holder. That is the case of the Indiana Miamis.

So clear is this that if--as we do not for a moment believe--there was any error by the Department of the Interior in failing to consider principles of tribal abandonment explicitly instead of proceeding under the recognition regulation, it was a harmless one. And

the doctrine of harmless error is applicable to administrative as to judicial decisions. 5 U.S.C. sec. 706(2)(F); MBH Commodity Advisors, Inc. v. CFTC, No. 00-1957, 2001 WL 476908, at *10 (7th Cir. May 7, 2001); Sahara Coal Co. v. Office of Workers' Compensation Programs, 946 F.2d 554, 558 (7th Cir. 1991); Sierra Club v. United States Fish & Wildlife Service, 245 F.3d 434, 444 (5th Cir. 2001).

Affirmed.