386 F.3d 1271
 Patrick L. KAHAWAIOLAA; Virgil C. Day; Samuel L. Kealoha, Jr.; Josiah L. Hoohuli; Ka Lahui Hawai'i, Plaintiffs-Appellants,
v.
Gale A. NORTON, in her capacity as Secretary of the Department of the Interior of the United States of America, Defendant-Appellee.
 No. 02-17239.
 United States Court of Appeals, Ninth Circuit.
 Argued November 7, 2003.
 Submitted October 27, 2004.
 Filed October 27, 2004.
 
 Walter R. Schoettle and Emmett E. Lee Loy, Honolulu, HI, for the appellants.
 Elizabeth A. Peterson, Ellen J. Durkee, Environment & Natural Resources Division, Jeffery Bossert Clark, Deputy Assistant Attorney General, Thomas L. Sansonetti, Assistant Attorney General, Department of Justice, Washington, D.C.; R. Michael Burke, Assistant United States Attorney and Edward H. Kubo, Jr., United States Attorney, Honolulu, HI, for the appellee.
 Appeal from the United States District Court for the District of Hawaii, Alan C. Kay, District Judge, Presiding. D.C. No. CV-01-00817-ACK.
 Before: BROWNING, REINHARDT, and THOMAS, Circuit Judges.
 THOMAS, Circuit Judge:
 
 
 1
 In this appeal, we consider whether the exclusion of native Hawaiians from the Department of Interior's regulations acknowledging the federally recognized status of Indian tribes comprises discrimination in violation of the Equal Protection component to the Fifth Amendment's Due Process Clause. We have jurisdiction to determine whether the regulations are unconstitutional, and we conclude that they do not violate the Fifth Amendment under rational basis scrutiny.
 
 
 2
 * Despite the importance of the inquiry, the United States has struggled to find an adequate definition of an Indian tribe. There is no universally recognized legal definition of the phrase, and no single federal statute defining it for all purposes. Felix S. Cohen, Federal Indian Law 3 (1982). As a general matter, the Supreme Court has described a tribe as "a body of Indians of the same or similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." Montoya v. United States, 180 U.S. 261, 266, 36 Ct.Cl. 577, 21 S.Ct. 358, 45 L.Ed. 521 (1901).
 
 
 3
 The significance of the question is immediately apparent from the text of the Indian Commerce Clause of the United States Constitution, which gives Congress power "[t]o regulate Commerce ... with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. (emphasis added). Much of the theory that underpins Indian law is that the Indian tribes possessed certain sovereign rights based on their existence as distinct political entities exercising authority over their members prior to the incorporation of their territory into the United States, United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); thus, "tribes retain whatever inherent sovereignty they had as the original inhabitants of this continent to the extent that sovereignty has not been removed by Congress." Montana v. Gilham, 133 F.3d 1133, 1137 (9th Cir.1998).
 
 
 4
 Despite this general recognition of inherent sovereignty (and, perhaps, the irony), as far as the federal government is concerned, an American Indian tribe does not exist as a legal entity unless the federal government decides that it exists.[1] Federal recognition affords important rights and protections to Indian tribes, including limited sovereign immunity, powers of self-government, the right to control the lands held in trust for them by the federal government, and the right to apply for a number of federal services. "Federal recognition may arise from treaty, statute, executive or administrative order, or from a course of dealing with the tribe as a political entity." William C. Canby, Jr., American Indian Law in a Nutshell 4 (4th ed.2004).
 
 
 5
 One of the more important periods in federal recognition of Indian Tribes commenced with the passage of the Indian Reorganization Act in 1934, 25 U.S.C. § 461 et seq., which was intended in part to permit the tribes to set up legal structures designed to aid in self-government. To organize as an Indian tribe, a group would need to adopt an appropriate constitution and bylaws, ratified by a majority vote of the adult members of the tribe. In addition, the organization was required to be approved by the Secretary of the Department of Interior. See 25 U.S.C. §§ 476, 477.[2] As a result of this process, ninety-nine tribes were organized; nintey-six were excluded. Alva C. Mather, Old Promises: The Judiciary and the Future of Native American Federal Acknowledgment Litigation, 151 U. Pa. L.Rev. 1827, 1831 (2003).
 
 
 6
 Thus, prior to the late 1970's, the federal government recognized American Indian tribes on a case-by-case basis. See 59 Fed.Reg. 9280 (1994); Golden Hill Paugussett Tribe v. Weicker, 39 F.3d 51, 57 (2d Cir.1994). In 1975, Congress established the American Indian Policy Review Commission to survey the current status of Native Americans. The Commission highlighted a number of inconsistencies in the Department of Interior tribal recognition process and special problems that existed with non-recognized tribes. As a result, in 1978, the Department of Interior exercised its delegated authority and promulgated regulations establishing a uniform procedure for "acknowledging" American Indian Tribes. 25 C.F.R. § 83.1 et seq. Acknowledgment under these regulations is a prerequisite for certain federal services and benefits, entitling tribes "to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States...." 25 C.F.R. § 83.2.
 
 
 7
 Pursuant to the acknowledgment regulations, the Department of Interior reviews an application for recognition to determine whether the tribe can meet an extensive list of mandatory criteria: (a) the group has been identified from historical times to the present, on a substantially continuous basis, as Indian; (b) "a predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present"; (c) the group "has maintained political influence or other authority over its members as an autonomous entity from historical times until the present"; (d) the group has a governing document; (e) the group has lists of members demonstrating their descent from a tribe that existed historically; (f) most of the members are not members of any other acknowledged Indian tribe; (g) the group's status as a tribe is not precluded by congressional legislation. 25 C.F.R. § 83.7. The Department of Interior applies its expertise to this determination and has established the Branch of Acknowledgment and Research which staffs historians and anthropologists to determine whether groups seeking recognition "actually constitute Indian tribes and presumably to determine which tribes have previously obtained federal recognition." James v. United States Dep't of Health and Human Servs., 824 F.2d 1132, 1138 (D.C.Cir.1987) (citing 25 C.F.R. § 83.6(b)); see also 25 C.F.R. § 83.11(e)(8). Thus, through its broad delegation and acknowledgment regulations, the Department of Interior has assumed much of the responsibility for determining which tribes have met the requirements to be acknowledged as a tribe with a government-to-government relationship with the United States.
 
 
 8
 However, by their terms, the regulations are applicable "only to those American Indian groups indigenous to the continental United States which are not currently acknowledged as Indian tribes by the Department." 25 C.F.R. 83.3(a). The regulations define the "continental United States" as the "contiguous 48 states and Alaska." 25 C.F.R. 83.1. This geographic limitation means that native Hawaiians are excluded from eligibility to petition for tribal recognition under the regulations. Bluntly put, the Department of Interior was hanging out a sign that said: "No Hawaiians need apply."
 
 
 9
 It is this geographic limitation that is subject of this suit. Plaintiffs, who are native Hawaiians or native Hawaiian groups as defined by the Hawaiian Homes Commission Act, 42 Stat. 108, brought the present action seeking the right to apply for federal acknowledgment as an Indian tribe or tribes pursuant to 25 C.F.R., Part 83. Plaintiffs filed a complaint in the federal district of Hawaii alleging that by excluding native Hawaiians from the regulatory tribal acknowledgment process, the federal regulations exclude native Hawaiians from the benefits and protections of the Indian Reorganization Act, 25 U.S.C. § 461 et seq., and Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 et seq., and that such exclusion is unconstitutional racial discrimination in violation of Plaintiffs' equal protection rights. The complaint sought declaratory and injunctive relief: a declaratory judgment that 25 C.F.R. §§ 83.1 and 83.3 amount to unconstitutional racial discrimination in violation of the Fifth Amendment, and a permanent injunction "enjoining and restraining Defendant, and her agents ... from administering 25 C.F.R., Part 83 and the Indian Reorganization Act ... and the Indian Self-Determination Act ... in a manner that excludes indigenous Hawaiians from the benefits and protection thereunder."
 
 
 10
 The Department of Interior filed a motion to dismiss for failure to state a claim, which the district court granted. The district court reasoned that the "requested relief necessarily involves the Court in deciding whether the [Department of Interior], and Congress, have inappropriately excluded Native Hawaiians from tribal recognition." Kahawaiolaa v. Norton, 222 F.Supp.2d 1213, 1222 (D.Haw.2002). Thus, the court found that "Plaintiffs' case raises a nonjusticiable political question because their challenge to the regulations surrounding tribal recognition involves matters that have been constitutionally committed to the other branches; and resolution by the Court would show a lack of respect due to the coordinate branches." Id. at 1219.
 
 
 11
 The district court alternatively held that because Congress has not entered into a government-to-government relationship with native Hawaiians, the Department of Interior had a rational basis to exclude native Hawaiians from the acknowledgment regulations and there was no equal protection violation. The court thus granted the Department of Interior's motion to dismiss and denied Plaintiffs' motion for summary judgment. Id. at 1223 & n. 14. The Plaintiffs timely appealed. We review the dismissal for failure to state a claim on which relief can be granted de novo. Libas Ltd. v. Carillo, 329 F.3d 1128, 1130 (9th Cir.2003).
 
 II
 
 12
 At the onset, we must decide whether the issue before us is justiciable or whether, as the district court determined, the political question doctrine precludes our consideration of the merits. We conclude it does not.
 
 
 13
 As Chief Justice Marshall observed in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803), "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court examined the political question doctrine and established the contours of the inquiry:
 
 
 14
 Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 
 
 15
 Id. at 217, 82 S.Ct. 691.
 
 
 16
 The Supreme Court observed that: "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of `political questions,' not one of `political cases.'" Id.
 
 
 17
 If the question before us were whether a remedy would lie against Congress to compel tribal recognition, the answer would be readily apparent. There is a "textually demonstrable constitutional commitment" to Congress "[t]o regulate Commerce ... with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. Thus, the Supreme Court has often declared that, based on this and other provisions of the Constitution, "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights." South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (citing Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)). Pursuant to this plenary power, "Congress has the power, both directly and by delegation to the President, to establish the criteria for recognizing a tribe." Miami Nation v. United States Dep't of Interior, 255 F.3d 342, 345 (7th Cir.2001). Thus, it is quite correct to say that a suit that sought to direct Congress to federally recognize an Indian tribe would be non-justiciable as a political question. see United States v. Sandoval, 231 U.S. 28, 46, 34 S.Ct. 1, 58 L.Ed. 107 (1913) (explaining that the "questions whether, to what extent, and for what time [Indian groups] shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts."). For the same reason, as courts have recognized, "`the action of the federal government in recognizing or failing to recognize a tribe has traditionally been held to be a political one not subject to judicial review.'" Miami Nation, 255 F.3d at 347 (quoting William C. Canby, Jr., American Indian Law in a Nutshell 5 (3d ed.1998)).
 
 
 18
 However, that is not what the Plaintiffs seek in this legal action. Rather, they seek to invalidate a provision that forbids them from applying to the Department of Interior for recognition under the same regulatory criteria applied to indigenous peoples in other states. That presents a different question and a different issue for application of the political question doctrine.
 
 
 19
 As Judge Posner explained in Miami Nation, when the executive branch has "canalize[d] the discretion of its subordinate officials by means of regulations that require them to base recognition of Indian tribes on the kinds of determination, legal or factual, that courts routinely make," then "the executive brings the tribal recognition process within the scope of the Administrative Procedure Act." 255 F.3d at 348. Thus, the decisions of the Department of Interior in recognizing Indian tribes through the acknowledgment process are subject to normal judicial review under the Administrative Procedure Act. Id.
 
 
 20
 That constitutional questions concerning the administration of the acknowledgment regulations are justiciable was made abundantly clear in Greene v. Babbitt, 64 F.3d 1266 (9th Cir.1995), in which we held that the Department of Interior's acknowledgment procedures were subject to the Due Process Clause. Id. at 1274-75.
 
 
 21
 Here, Plaintiffs request a declaration that the portions of 25 C.F.R. § 83.1 and 83.3 which preclude Hawaiians from acknowledgment are unconstitutional. As established in Baker, "courts cannot reject as `no law suit' a bona fide controversy as to whether some action denominated `political' exceeds constitutional authority." Baker further emphasized the "necessity for discriminating inquiry into the precise facts and posture of the particular case...." 369 U.S. at 217, 82 S.Ct. 691 (emphasis added).
 
 
 22
 Indeed, the political question doctrine does not bar adjudication of a facial constitutional challenge even though Congress has plenary authority, and the executive has broad delegation, over Indian affairs. In INS v. Chadha, the Supreme Court held that the Constitution provided a legal basis for the court to resolve issues related to aliens even though Congress has plenary authority over aliens. 462 U.S. 919, 940-43, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The Court noted that, although Congress' plenary authority is not open to question, whether Congress constitutionally implemented that authority may be a proper challenge. The Court continued to explain that while the controversy may be termed "political," the "presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine." Id. at 942-43, 103 S.Ct. 2764. This rationale has been inferred with regard to Congress' plenary authority over tribal recognition. See Sandoval, 231 U.S. at 46, 34 S.Ct. 1 (concluding that while tribal recognition is a question for the political branches "it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe.")
 
 
 23
 Because Plaintiffs raise a facial constitutional challenge to the regulations which does not "demand" or even imply recognition of native Hawaiians, the federal courts are particularly suited to address their constitutional challenge as to the limitations of the regulation. The question is justiciable and our consideration of it is not precluded by the political question doctrine.[3]
 
 III
 
 24
 In determining whether the regulation violates the Fifth Amendment, we must first determine the level of scrutiny to apply. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Laws alleged to violate the constitutional guarantee of equal protection are generally subject to one of three levels of "scrutiny" by courts: strict scrutiny, intermediate scrutiny, or rational basis review. Tucson Woman's Clinic v. Eden, Nos. 02-17375, 02-17381, 02-17382, 2004 WL 1873707, *7 (9th Cir. Aug.23, 2004). Strict scrutiny is applied when the classification is made on "suspect" grounds such as race, ancestry, alienage, or categorizations impinging upon fundamental rights such as privacy, marriage, voting, travel, and freedom of association. Hoffman v. United States, 767 F.2d 1431, 1434-35 (9th Cir.1985). Laws are subject to intermediate scrutiny when they discriminate based on certain other suspect classifications, such as gender. Miss. Univ. for Women v. Hogan, 458 U.S. 718, 723-24, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). When no suspect class is involved and no fundamental right is burdened, we apply a rational basis test to determine the legitimacy of the classifications. Olagues v. Russoniello, 770 F.2d 791, 802 (9th Cir.1985). The conclusion of whether a governmental act is subject to strict scrutiny or rational basis examination is important, as it often determines the outcome of the inquiry. United States v. Dumas, 64 F.3d 1427, 1432 (9th Cir.1995) (Boochever, J. concurring).
 
 
 25
 The Plaintiffs argue that the classification is racially based and therefore subject to strict scrutiny. The Department of Interior contends that the classification is politically based and therefore reviewed under the rational basis test. We conclude that the regulation should be examined under rational basis review.
 
 
 26
 Historically, the formal relationship between the United States and American Indian tribes has been political, rather than race-based. The Indian Commerce Clause speaks to regulation of commerce with tribes, not individuals. U.S. Const., Art. I, § 8, cl. 3. Indeed, historical evidence suggests that "the Founders regarded Indians as distinct nations to be dealt with diplomatically and at arm's length." Saikrishna Prakash, Against Tribal Fungibility, 89 Cornell L.Rev. 1069, 1080 (2004).
 
 
 27
 In Morton v. Mancari, the Supreme Court explained that employment preferences for certain qualified Indians in the Bureau of Indian Affairs, did not constitute "racial discrimination," or even a "racial" preference. 417 U.S. 535, 553-54, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). This is because "the preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." Id. at 554, 94 S.Ct. 2474. Thus, as long as special treatment is "tied rationally to the fulfillment of Congress' unique obligation toward Indians, such legislative judgments will not be disturbed." Id. at 555, 94 S.Ct. 2474.
 
 The Supreme Court subsequently explained:
 
 28
 The decisions of this Court leave no doubt that federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications. Quite the contrary, classifications expressly singling out Indian tribes as subjects of legislation are expressly provided for in the Constitution and supported by the ensuing history of the Federal government's relations with Indians.
 
 
 29
 United States v. Antelope, 430 U.S. 641, 645, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977). The Court further stated that federal regulation of Indian tribes "is governance of once-sovereign political communities; it is not to be viewed as legislation of a `racial' group consisting of `Indians'" Id. at 646, 97 S.Ct. 1395 (quoting Mancari, 417 U.S. at 553, 94 S.Ct. 2474, internal quotations omitted).
 
 
 30
 Plaintiffs argue that Rice v. Cayetano, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), and Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), require application of strict scrutiny because native Hawaiians comprise a racial group against which the Department of Interior's regulations discriminate. Indeed, Adarand held that "all racial classifications... must be analyzed by a reviewing court under strict scrutiny." 515 U.S. at 227, 115 S.Ct. 2097.
 
 
 31
 In the context of a Fifteenth Amendment challenge to Hawaii's voting scheme for trustees of a state agency, Rice concluded that a statutory definition of native Hawaiian "used ancestry as a racial definition and for a racial purpose." 528 U.S. at 515, 120 S.Ct. 1044. In reaching this conclusion, Rice explained that although native Hawaiians derived from diverse backgrounds, they were isolated from migration, and shared common physical characteristics and culture. As such, the state's definition of native Hawaiian in its voting scheme singled out an identifiable class of persons based on ancestry and ethnic characteristics. Id. at 514-15, 120 S.Ct. 1044.
 
 
 32
 The racial classification of native Hawaiians in Rice does not apply to this case. In fact, Rice explicitly reaffirmed and distinguished the political, rather than racial, treatment of Indian tribes as explained in Mancari. The issue did not concern recognition of quasi-sovereign tribes. Instead, Rice concerned elections of the State of Hawaii to which the Fifteenth Amendment applied, and application of Mancari to such facts would "permit a State, by racial classification, to fence out whole classes of its citizens...." 528 U.S. at 522, 120 S.Ct. 1044. In short, at its core, Rice concerned the rights of individuals, not the legal relationship between political entities.
 
 
 33
 Rice does not bear on the instant case because Plaintiffs' claim challenges the very regulations that acknowledge the quasi-sovereign, government-to-government relationship between the United States and Indian tribes. While Congress may not authorize special treatment for a class of tribal Indians in a state election, Congress certainly has the authority to single out "a constituency of tribal Indians" in legislation "dealing with Indian tribes and reservations." Rice, 528 U.S. at 519-20, 120 S.Ct. 1044.
 
 
 34
 As Rice illustrates, an "Indian tribe" may be classified as a "racial group" in particular instances—certainly continental tribes can identify a common culture and ethnicity. We reject the notion that distinctions based on Indian or tribal status can never be racial classifications subject to strict scrutiny. The preference in Mancari "[was] not directed towards a `racial' group consisting of `Indians'; instead, it applie[d] only to members of `federally recognized' tribes ... In this sense, the preference is political rather than racial in nature." Mancari, 417 U.S. at 543 n. 24, 94 S.Ct. 2474. Government discrimination against Indians based on race or national origin and not on membership or non-membership in tribal groups can be race discrimination subject to strict scrutiny. See Adarand, 515 U.S. at 227, 115 S.Ct. 2097. However, the recognition of Indian tribes remains a political, rather than racial determination. Recognition of political entities, unlike classifications made on the basis of race or national origin are not subject to heightened scrutiny. Consequently, we apply rational basis review to the Department of Interior regulations.[4]
 
 IV
 
 35
 Rational basis review, as we have oft-observed, is "highly deferential." United States v. Hancock, 231 F.3d 557, 566 (9th Cir.2000). If the classification at issue does not involve fundamental rights or suspect classes, it must be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." Heller v. Doe, 509 U.S. 312, 319-20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). In defending a statute on rational-basis review, the government "has no obligation to produce evidence to sustain the rationality of a statutory classification"; rather, "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." Id. at 320, 113 S.Ct. 2637 (internal quotations and citations omitted).
 
 
 36
 As the Supreme Court has stated, under rational basis review:
 
 
 37
 the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.
 
 
 38
 Nordlinger v. Hahn, 505 U.S. 1, 11-12, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (citations omitted).
 
 
 39
 At first blush, even under rational basis review, a geographic exception to an otherwise uniform federal regulation appears problematic. If, for example, the regulation had drawn a line at the Yellow-stone River in Montana and provided that similarly situated tribes north of the river were eligible to apply for recognition, but those south were not, it would be difficult to justify such a classification. However, the origin of the acknowledgment regulations and the unique history of Hawaii provide sufficient basis to sustain the regulation against an equal protection challenge under the highly deferential rational basis review.
 
 
 40
 As we have discussed, the origin of the acknowledgment regulations is found in the Indian Reorganization Act, which repudiated the general policy of allotment whereby reservation lands were allotted to tribal members who could ultimately transfer such lands to nonmembers. Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408, 436, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989); citing Cohen, supra, at 614 (explaining that major purposes of the Indian Reorganization Act included ending allotment and assisting tribes in restoring an adequate land base). The Indian Reorganization Act, however, specifically confined its geographic reach. It defined "Indian" as including:
 
 
 41
 all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation.
 
 
 42
 25 U.S.C. § 479.
 
 
 43
 Thus, by its terms, the Indian Reorganization Act did not include any native Hawaiian group. There were no recognized Hawaiian Indian tribes under federal jurisdiction in 1934, nor were there any reservations in Hawaii. Although Hawaii and Alaska were both United States territories in 1934, only Alaska was specifically included. See 25 U.S.C. § 473 ("The provisions of this Act shall not apply to any of the Territories, colonies, or insular possessions of the United States, except that sections 9, 10, 11, 12, and 16 (25 U.S.C.A. §§ 469, 470, 471, 472, 476) shall apply to the Territory of Alaska.").
 
 
 44
 A similar distinction was made in the Indian Self-Determination and Education Assistance Act ("ISDEA"), 25 U.S.C. § 450 et seq., another statute upon which the Plaintiffs rely. Congress passed ISDEA to give Indian tribes greater control over their education programs. Cohen, supra, at 194; 25 U.S.C. § 450a(a). However, as with the Indian Reorganization Act, the ISDEA excludes Hawaiian Native Americans, defining an "Indian" as "a person who is a member of an Indian tribe," and an "Indian tribe" is "any tribe, band, nation or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act ... which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 450b(d), (e). Thus, Congress has evidenced an intent to treat Hawaiian natives differently from other indigenous groups.[5]
 
 
 45
 In great part, the reason for this is inextricably entwined with the unique history of Hawaii and its relationship with the United States. In Rice, the Supreme Court had the opportunity to generally describe the origins and background of native Hawaiians. Relevant to our present discussion, the Court explained that the "usual assumption" is that the first Hawaiians were Tahitian Polynesians who settled the islands around A.D. 750. By the time England's Captain Cook visited the islands in 1778, the Hawaiian people had developed well-established traditions and customs, with a defined cultural and political structure. In 1810, the islands were united as one kingdom under Kamehameha I. Rice, 528 U.S. at 500-01, 120 S.Ct. 1044. While Hawaii's island geography developed a society of diverse ethnic backgrounds and cultures, it was isolated from migration for centuries, its indigenous inhabitants shared common physical characteristics, and by 1778 had developed a common culture. Id. at 514-15, 120 S.Ct. 1044.
 
 
 46
 European and American settlement of the region did not begin in earnest until 1820, and the west played an increasing economic and political role throughout the 1800s. Rice, 528 U.S. at 501, 120 S.Ct. 1044. From 1826 until 1893, the United States recognized the independence of the Kingdom of Hawaii and entered into treaties and conventions with Hawaiian monarchs to govern commerce and navigation in 1826, 1842, 1849, 1875, and 1887. Pub.L. No. 103-150, 107 Stat. 1510. Significantly for our purposes, in 1871 at a midpoint during this period, Congress passed legislation refusing to recognize tribes as nations with which the United States could make treaties. 25 U.S.C. § 71. Thus, and quite naturally, during this period, Congress viewed Hawaii as a separate kingdom and not as an organized tribe.
 
 
 47
 On January 14, 1893, John L. Stevens, the United States Minister to the Kingdom of Hawaii, conspired to overthrow the existing government in Hawaii and positioned armed naval forces to effectuate his plan. On January 17, 1893, American and European settlers ousted Queen Liliukalani and proclaimed the establishment of a Provisional Government. Soon thereafter, Queen Liliukalani yielded her authority to the United States government. Pub.L. No. 103-150, 107 Stat. 1510.
 
 
 48
 In 1898, President McKinley signed the Newlands Resolution to annex the Hawaiian Islands as territory of the United States. Pursuant to this resolution, the Republic of Hawaii ceded all former public lands to the United States. In 1900, the Hawaiian Organic Act established the Territory of Hawaii, and asserted control over ceded lands. Rice, 528 U.S. at 505, 120 S.Ct. 1044 (citing 30 Stat. 750; Act of Apr. 30, 1900, ch. 339, § 91, 31 Stat. 159).
 
 
 49
 In 1921, Congress enacted the Hawaiian Homes Commission Act ("Commission Act"), 42 Stat. 108, which designated approximately 200,000 acres ("Hawaiian home lands") "for the welfare and rehabilitation of native Hawaiians." Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes Comm'n, 588 F.2d 1216, 1218 (9th Cir.1978). The Commission Act was "ostensibly designed to rehabilitate the declining indigenous Hawaiians by facilitating their access to farm and homestead lands." Id. However, when Hawaii was finally admitted to the Union in 1959[6] the Hawaii Admission Act, Pub.L. No. 86-3, 73 Stat. 5 (1959), transferred responsibility for the administration of the Hawaiian home lands to the state. Id. In short, the history of the indigenous Hawaiians, who were once subject to a government that was treated as a co-equal sovereign alongside the United States until the governance over internal affairs was entirely assumed by the United States, is fundamentally different from that of indigenous groups and federally recognized Indian tribes in the continental United States.
 
 
 50
 Furthermore, since becoming the 50th State, Congress has established a program of federal benefits and entitlements for native Hawaiians that is different from that afforded federally recognized Indian tribes in the contiguous United States and Alaska. Although native Hawaiians enjoy many of the "same rights and privileges accorded to American Indian, Alaska Native, Eskimo, and Aleut communities" under certain statutes, 42 U.S.C. § 11701(19) (citing, inter alia, the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001, and the Native American Programs Act of 1974, 42 U.S.C. § 2991), Congress, because of the unique history of Hawaii, has excluded them from some statutes while enacting others that benefit native Hawaiians only. See e.g., The Commission Act, 42 Stat. 108; The Native Hawaiian Education Act, 20 U.S.C. §§ 7511-7517; The Native Hawaiian Health Care Improvement Act of 1992, 42 U.S.C. §§ 11701-11714. We find it significant that Congress has specifically included both native Hawaiians and members of American Indian tribes in certain privilege-granting statutes while specifically excluding either native Hawaiians or tribal members from a number of others. As the Department of Interior points out, many statutes distinguish between native Hawaiians and members of Indian tribes. See, e.g., 25 U.S.C. § 3001(6), (7), (10), (11), (12).
 
 
 51
 It is rational for Congress to provide different sets of entitlements—one governing native Hawaiians and another governing members of American Indian tribes. It would also be rational for Congress to decide that native Hawaiians should be prohibited from applying for federal recognition. Otherwise, as members of a newly recognized Indian tribe or tribes, native Hawaiians would be entitled to the special rights and privileges granted to native Hawaiians and to those accorded to American Indians. Granting federal recognition to native Hawaiians as an Indian tribe or tribes would serve to blur the categorical distinction between the two groups, frustrate at least to some degree Congress' intent to treat the two groups differently, and allow native Hawaiians to obtain greater benefits than the members of all American Indian tribes.
 
 
 52
 There is also the question of whether native Hawaiians constitute one large tribe, perhaps retaining some form of internal governance by the Office of Hawaiian Affairs or the Hawaiian Homes Commission, or whether there are, in fact, several different tribal groups, such as the Hou Hawaiians. See Price v. Hawaii, 764 F.2d 623 (9th Cir.1985); see generally Stuart, 106 Yale L.J. at 580-81. These questions are not easily resolved within the traditional federal recognition paradigm.
 
 
 53
 In short, the status of native Hawaiians as recognized tribes continues to raise "questions of considerable moment and difficulty," and is ultimately "a matter of some dispute." Rice, 528 U.S. at 518, 120 S.Ct. 1044. Congress' treatment and relationship with native Hawaiians is a veritable patchwork of legislation, findings, resolutions and historic treaties. Given this, the unique history of Hawaii, and the historical restrictions of the acknowledgment process to continental American Indian tribes, we conclude that the Department of Interior's classification passes constitutional muster on rational basis review.
 
 V
 
 54
 Although we conclude that the Department of Interior's exclusion of Hawaiians passes constitutional muster, we recognize that, in many ways, the result is less than satisfactory. We would have more confidence in the outcome if the Department of Interior had applied its expertise to parse through history and determine whether native Hawaiians, or some native Hawaiian groups, could be acknowledged on a government-to-government basis. It would have been equally rational, if perhaps not more so, for the Department to have decided to undertake that inquiry in the first instance. However, under equal protection rational basis review, it is not for us "to judge the wisdom, fairness, or logic" of the choices made. Heller, 509 U.S. at 319, 113 S.Ct. 2637 (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Thus, in the end, we must commit this question to Congress to apply its wisdom in deciding whether or not native Hawaiians should be included among those eligible to apply for federal tribal recognition.
 
 
 55
 We affirm the judgment of the district court.[7]
 
 
 56
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 This is not to say, obviously, that non-federally recognized tribes do not exist, or do not possess rights. However, as a general matter, absent federal recognition, tribes do not enjoy the same status, rights, and privileges accorded federally recognized tribesSee, e.g., 25 C.F.R. § 83.2.
 
 
 [2]
 In connection with the tribal reorganization established under the Indian Reorganization Act, the Department of Interior developed five considerations in determining whether a group constituted a tribe: (1) That the group has had treaty relations with the United States; (2) That the group has been denominated a tribe by act of Congress or executive order; (3) That the group has been treated as having collective rights in tribal lands or funds, even though not expressly designated a tribe; (4) That the group has been treated as a tribe or band by other Indian tribes; and (5) That the group has exercised political authority over its members, through a tribal council or other governmental forms. Cohen,supra, at 13.
 
 
 [3]
 The Department of Interior also urges that this case is not justiciable under the political question doctrine because the record does not demonstrate that Congress has established a government-to-government relationship with any native Hawaiian tribe. This reasoning is entirely circular and contradictory. It asks us to decide the ultimate question of whether Congress has established such a relationship, then declare the question we have just decided as non-justiciable. Further, the application of the regulations at issue is designed to decide that question, subject to judicial review. 25 C.F. R. § 83.2. The government's argument also begs the constitutional question at hand, which is whether the regulations prohibiting indigenous native Hawaiians from applying for recognition violate the Fifth Amendment—not whether such groups are entitled to recognition. Finally, the issue is far from clear. A detailed factual analysis of the treaties, legislation and congressional findings applicable to native Hawaiians requires a more detailed review than we are equipped to handle on the present record. Indeed, the Supreme Court even noted that whether Congress may treat native Hawaiians as Indian tribes "is a matter of some dispute."Rice v. Cayetano, 528 U.S. 495, 518, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000).
 
 
 [4]
 We are also quite mindful that the application of strict scrutiny in this instance might have profound consequences in other contexts. As inMancari, North American Indian tribes have often urged that a rational basis examination should apply to programs that benefit tribes. Further, there are numerous statutes in Hawaii that provide special benefits to native Hawaiians. See Stuart Minor Benjamin, Equal Protection and the Special Relationship: The Case of Native Hawaiians, 106 Yale. L.J. 537, 540 (1996).
 
 
 [5]
 We recognize that the distinctions that we have drawn are between native Hawaiians as a whole and federally recognized Indian tribes, whereas the question that confronts us is whether native Hawaiians as a whole should be treated in a manner similar to non-federally recognized indigenous Indian groups that seek federal tribal status in the continental United States. We do not think that the difference between the two groups of native Americans domiciled in the continental United States is of legal significance for purposes of our opinion. The critical factor is the similarity of the geographic and historical circumstances of indigenous native American groups, federally recognized as Indian tribes or not, and the contrast between those circumstances and the geographic and historic circumstances of native Hawaiians as a whole
 
 
 [6]
 The first Hawaii statehood bill was introduced in the 65th Congress in 1919See Keaukaha-Panaewa, 588 F.2d at 1223 (quoting S.Rep.No. 80, 86th Cong., 1st Sess. (1959)).
 
 
 [7]
 Given our resolution of the issues, it is unnecessary for us to reach any of the other issues urged by the parties