# United States Court of Appeals for the Federal Circuit

—————————————

**WYANDOT NATION OF KANSAS, AKA
WYANDOTTE TRIBE OF INDIANS,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

—————————————

2016-1654

—————————————

Appeal from the United States Court of Federal
Claims in No. 1:15-cv-00560-TCW, Judge Thomas C.
Wheeler.

—————————————

Decided: June 8, 2017

—————————————

MARIO GONZALEZ, Gonzalez Law Office, Prof. LLC,
Rapid City, SD, argued for plaintiff-appellant. Also repre-
sented by BRIAN JOHN LEINBACH, Engstrom, Lipscomb &
Lack, Los Angeles, CA.

ALLEN M. BRABENDER, Environment and Natural Re-
sources Division, United States Department of Justice,
Washington, DC, argued for defendant-appellee. Also
represented by JOHN C. CRUDEN.

—————————————

Before DYK, O'MALLEY, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Concurring in the result filed by *Circuit Judge* O'MALLEY.

DYK, *Circuit Judge.*

The Wyandot Nation of Kansas ("Wyandot Nation") is a Native American tribe allegedly tracing its ancestry to the Historic Wyandot Nation. It claims to be a federally recognized Indian tribe and a successor-in-interest to all of the treaties between the Historic Wyandot Nation and the United States. On June 1, 2015, Wyandot Nation filed a complaint in the United States Court of Federal Claims alleging that the United States had breached its trust and fiduciary obligations with respect to two trusts that resulted from prior treaties, including one related to amounts payable under a treaty signed in 1867 and one related to the Huron Cemetery. The Court of Federal Claims dismissed without prejudice for lack of jurisdiction and standing. Wyandot Nation appeals. We affirm.

BACKGROUND

I

One of the disputes here concerns the claimed entitlement of the appellant to an accounting of a trust fund allegedly resulting from an 1867 treaty (called the Category One claims). The background of the dispute is as follows.

A

The Historic Wyandot Nation resided in modern-day Ohio and Michigan. In 1842, the Historic Wyandot Nation ceded to the United States all of its lands and possessions in Ohio and Michigan in exchange for a promise of 148,000 acres west of the Mississippi. That land grant never occurred, forcing the Historic Wyandot Nation to purchase 1,920 acres of land located in modern-day Kan-

sas from the Delaware Tribe in 1848. In 1850, the Historic Wyandot Nation and the United States entered into a treaty, rescinding any claims the Historic Wyandot Nation may have had with respect to the previously promised 148,000 acres, in exchange for $100,000 and extinguishing the Historic Wyandot Nation's debt to the Delaware Tribe for its 1848 land purchase. *See* Treaty with the Wyandot, Apr. 1, 1850, 9 Stat. 987 ("Treaty of 1850").

In 1855, the United States entered into another treaty with the Historic Wyandot Nation, in which the tribe agreed to be dissolved and to cede its lands to the United States, in exchange for the ceded lands to be divided in fee simple to the individual tribe members, a payment of $380,000 to be distributed equally among tribe members, and the $100,000 payment from the Treaty of 1850 also be distributed equally among tribe members. *See* Treaty with the Wyandots, Jan. 31, 1855, 10 Stat. 1159 ("Treaty of 1855").

During the Civil War, many Native American tribes suffered hardships and were forced to sell their lands. In response, in 1867, the United States entered into a new treaty with several tribes. *See* Treaty with the Seneca, etc., Feb. 23, 1867, 15 Stat. 513, 516 ("Treaty of 1867"). The Treaty of 1867 set aside 20,000 acres of federally purchased lands in Oklahoma to become a reservation for a newly-constituted Wyandot Tribe, and it allowed individual Wyandot Indians to choose to either become members of this newly reconstituted tribe or become United States citizens.

Schedule A, appended to the Treaty of 1867, provided for the payment of $28,109.51—to be divided and paid to Wyandot Indians and their heirs—to satisfy what was determined to be due from the claims of the Wyandots against the United States, for all of its former treaties and

sales of treaty lands. The parties dispute whether these funds were properly paid. The United States asserts that it had correctly paid the amounts due in 1882 to the rightful claimants. The appellant asserts that there are unpaid amounts due to the heirs of Wyandot Nation that the United States currently holds in trust, for which the appellant is owed a full accounting and fiduciary trust duties.

The parties in this case also dispute the relationship of the modern-day Wyandot Nation of Kansas to the Wyandot Tribe recognized by the Treaty of 1867. The government asserts that this newly reconstituted tribe became known as the Wyandotte Nation. The federal government recognizes the Wyandotte Nation of Oklahoma as its present day successor. That tribe has its headquarters in Wyandotte, Oklahoma.

The appellant, on the other hand, asserts that despite the Treaty of 1855, the Historic Wyandot Nation did not dissolve. Rather, the appellant contends that after the Treaty of 1867 was executed, some tribe members moved to the Oklahoma reservation established under the treaty, while others chose to remain in Kansas. According to the appellant, these two separate bands—of which the Wyandotte Nation of Oklahoma and the Wyandot Nation of Kansas are the modern-day successors—were *both* a part of the newly constituted Wyandot Tribe in 1867. The appellant therefore asserts that it is a federally recognized tribe by virtue of the Treaty of 1867. However, in a 1996 settlement agreement with the Wyandotte Nation of Oklahoma over disputed land use, the appellant also admitted that "the Kansas Wyandot is a non-federally recognized . . . Indian Tribe." S.A. 36.

In 1937, the Oklahoma band reorganized as a separate tribe under the Oklahoma Indian Welfare Act ("OIWA"), which provided that "[a]ny recognized tribe or

band of Indians residing in Oklahoma shall have the right to organize for its common welfare." 49 Stat. 1967 § 3 (1936). In 1959, the Kansas band changed its name to the Wyandot Nation of Kansas. The Wyandot Nation of Kansas is currently incorporated under Kansas law.

## B

In 1994, Congress enacted the American Indian Trust Fund Management Reform Act ("Reform Act"), Pub. L. No. 103-412, 108 Stat. 4239 (1994), which provided that "[t]he Secretary [of the Interior] shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe." 25 U.S.C. § 4011(a). The Reform Act defined "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community, . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 4001(2).

Almost simultaneously, Congress also enacted the Federally Recognized Indian Tribe List Act of 1994 ("List Act"), Pub. L. No. 103-454, 108 Stat. 4791 (1994), which provided that

> the Secretary of the Interior is charged with the responsibility of keeping a list of all federally recognized tribes; . . . the list published by the Secretary shall be accurate, regularly updated, and regularly published . . . ; and . . . the list of federally recognized tribes which the Secretary publishes should reflect all of the federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

*Id.* § 103(6)–(8). The List Act approved existing regulations spelling out a mechanism whereby any entity not on

the annual Department of the Interior ("Interior") list can pursue federal recognition. *See* 25 C.F.R. pt. 83(c).

Wyandot Nation is not on the list maintained by the Secretary of the Interior. The appellant petitioned Interior in 1996 for federal recognition pursuant to the List Act regulations. Interior preliminarily determined that "the Wyandot Nation of Kansas, which consists of the descendants of the citizen Wyandotts of Kansas terminated in 1855, [does not qualify for] Federal acknowledgement through the administrative process and can only become a Federally recognized Indian Tribe by an act of Congress." S.A. 20. The appellant did not pursue further administrative or judicial review of this agency action.

One other statutory provision is pertinent. During the period from 1990 through 2014, the Department of Interior Appropriation Act riders provided that claims for losses or mismanagement of Indian trust funds do not accrue "until the affected Indian tribe or individual Indian has been furnished with an accounting of such funds." *See, e.g.*, Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, § 2, 128 Stat. 5, 305–06 ("Appropriation Riders").

## II

A second dispute in this case (called the Category Two claims) concerns the ownership of the Huron Cemetery in modern-day Kansas City, and funds derived from easements over this cemetery property.

Under the Treaty of 1855, certain ceded lands were exempt from assignment to individual members, including the Huron Cemetery, which was a historic Wyandot burial ground. Easements for city streets have traversed the Huron Cemetery since 1857. The parties dispute the current ownership interests of the Huron Cemetery. The appellant asserts that the United States holds the Huron

Cemetery land, as well as monies derived from easements, in trust for the benefit of the Wyandot Nation of Kansas. The United States maintains that it holds title to the Huron Cemetery in trust for the Wyandotte Nation of Oklahoma, and that the appellant possesses no beneficial interest in the land.

## III

On June 1, 2015, the appellant filed suit in the Court of Federal Claims, seeking an accounting of, and monetary damages from alleged mismanagement of, the Schedule A funds of the Treaty of 1867 (Category One claims), and funds that may have been derived from easements across the Huron Cemetery (Category Two claims). The government moved to dismiss for lack of jurisdiction, untimeliness, and failure to state a claim upon which relief can be granted.

With respect to the Category One claims, the Court of Federal Claims found that because the Wyandot Nation is not a federally recognized Indian tribe, it is not entitled to an accounting under the Reform Act. Because it is not entitled to an accounting under the Reform Act, the Wyandot Nation cannot rely on the Appropriations Riders to avoid the statute of limitations bar that would obviously apply to its fund mismanagement claims. That is, without the benefit of the Appropriation Riders, the six-year statute of limitations barred fund mismanagement claims that the appellant had known about since the 1880s. *See* 28 U.S.C. § 2501. The Claims Court therefore dismissed without prejudice the Category One claims for lack of jurisdiction.

With respect to the Category Two claims, the Court of Federal Claims found that based on prior litigation, the United States holds title to the Huron Cemetery in trust for the Wyandotte Nation of Oklahoma. Because the Wyandot Nation of Kansas has no beneficial interest in

the Huron Cemetery, the Claims Court dismissed without prejudice the Category Two claims for lack of standing.

The Wyandot Nation appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

This court reviews *de novo* a dismissal by the Court of Federal Claims for lack of jurisdiction and for standing. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *Frazer v. United States*, 288 F.3d 1347, 1351 (Fed. Cir. 2002). We may affirm the Court of Federal Claims' dismissal on any ground supported by the record. *El-Sheikh v. United States*, 177 F.3d 1321, 1326 (Fed. Cir. 1999).

DISCUSSION

I

Wyandot Nation asserts with respect to the Category One claims that it is entitled to an accounting of, and monetary damages for the mismanagement of, the Treaty of 1867 Schedule A funds that the United States holds in trust. The United States contends that the six-year statute of limitations has run on any such claim.

To the extent that Wyandot Nation asserts accounting and breach of trust claims based on the government's failure to make payment in the 1880s, such claims would be time-barred because the complaint alleges that the amounts that the government then calculated pursuant to Schedule A were "paid to the Wyandotte Tribe of Indians in 1888," J.A. 55, providing notice that the government had breached its obligations by failing to make full payment. Thus, the "claim made here would not be the sort of claim for which a final accounting would be necessary to put a plaintiff on notice of a claim, because claimants knew or should have known that the money was publicly distributed" in 1888, and the appellant would have no "right to wait for an accounting." *Wolfchild v. United*

*States*, 731 F.3d 1280, 1291 (Fed. Cir. 2013). The appellant's Category One claims therefore depend on its right to an accounting under the Reform Act,[1] which would arguably invoke the statute of limitations extensions provided by the Appropriation Riders.

Understanding this dispute thus requires descriptions of the Reform Act, the List Act, the corresponding regulations, and their relevant provisions. The Reform Act requires Interior to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe." 25 U.S.C. § 4011(a). The Appropriation Riders extend the statute of limitations to pursue accounting breach of trust claims under the Reform Act until after "the affected Indian tribe . . . has been furnished with an accounting of such funds." 128 Stat. at 305–06.

Only an "Indian tribe" is entitled to an accounting under the Reform Act. Wyandot Nation's right to an accounting, therefore, requires establishing that it is a federally recognized "Indian tribe," which the Reform Act defines as "any Indian tribe, band, nation, or other organized group or community, . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 4001(2). Both parties agree that

---

[1]    Appellant alleges that during the settlement negotiations of its 2005 lawsuit, *Wyandot Nation of Kansas v. Norton*, Case No. 1:05-cv-02491-THF (D.D.C.), "the Federal Government repeatedly promised to provide an accounting of the Wyandot Nation's trust funds and non-monetary trust funds." Appellant Br. 30. This refers to the fact that the government made non-binding *offers* for an accounting. There is no allegation here that these offers were accepted.

unless the appellant is a federally recognized Indian tribe, it has no right to an accounting under the Reform Act.

The government contends that a tribe cannot be a recognized Indian tribe within the meaning of the Reform Act unless it is recognized as such by the Secretary of the Interior under the List Act. The List Act requires the Secretary of the Interior to annually "publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be *eligible for the special programs and services provided by the United States to Indians because of their status as Indians.*" 25 U.S.C. § 479a-1 (emphasis added). If an entity is not on the list, regulations provide a process for petitioning for federal acknowledgement. *See* 25 C.F.R. pt. 83(c).

Wyandot Nation contends that being listed pursuant to the List Act is not a necessary condition to federal recognition. Appellant points out that the List Act provides that "Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in part 83 of the Code of Federal Regulations denominated 'Procedures for Establishing that an American Indian Group Exists as an Indian Tribe;' or by a decision of a United States court." 108 Stat. at 4791. Wyandot Nation asserts that it is already federally recognized pursuant to the Treaty of 1867 and that this treaty right should be recognized by the courts.

We are persuaded that the List Act regulatory scheme exclusively governs federal recognition of Indian tribes.

At the outset, we reject the government's contention that the doctrine of exhaustion of administrative remedies applies here. The government argues that Wyandot Nation failed to exhaust its administrative remedies at Interior for tribal recognition and that the List Act is a "statutory scheme [that] displaces Tucker Act jurisdiction." *Horne v. Dep't of Agric.*, 133 S. Ct. 2053, 2062

(2013). We do not agree. "The doctrine of exhaustion of administrative remedies . . . provides 'that no one is entitled to judicial relief . . . until the *prescribed administrative remedy* has been exhausted.'" *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006) (emphasis added). Had Wyandot Nation sought only federal recognition as an Indian tribe, dismissal for failure to exhaust the specific administrative remedies might have been appropriate, but the appellant's Category One claims are broader. Wyandot Nation is also seeking an accounting and monetary damages. Because there is no exclusive administrative remedy for an accounting and damages, we conclude that administrative exhaustion does not apply to the Category One claims and that there is no displacement of Tucker Act jurisdiction. *See, e.g.*, *Cobell v. Salazar*, 573 F.3d 808, 813 (D.C. Cir. 2009) ("The plaintiffs are entitled to an accounting under the [Reform Act] statute. The district court sitting in equity must do everything it can to ensure that Interior provides them an equitable accounting." (citation omitted)).

While the exhaustion doctrine does not apply here, we think that the doctrine of primary jurisdiction (treated by the government only in a footnote) requires that the appellant pursue the administrative remedies provided by the List Act.[2]

An explicit purpose of the List Act is to "establish[] procedures and criteria for . . . addition to the Department's list of federally recognized Indian tribes." 25 C.F.R. § 83.2. And the regulations specifically address entities like the Wyandot Nation, which is asserting that

---

[2] "[W]e may affirm the Court of Federal Claims' judgment on any ground supported by the record." *Music Square Church v. United States*, 218 F.3d 1367, 1373 (Fed. Cir. 2000).

it was "previously acknowledged as a federally recognized Indian tribe, or is a portion that evolved out of a previously federally recognized Indian tribe." 25 C.F.R. § 83.12(a). The regulations also provide guidance as to what needs to be shown to gain recognition. *See id.*

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63 (1956). The doctrine of primary jurisdiction

> applies where a claim is originally cognizable in the courts, . . . [but] enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case, the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Id.* at 64.

In *Western Pacific*, the Western Pacific Railroad billed the government for a freight shipment, but the parties disputed the accuracy of the billing because they disagreed as to the applicable tariff rate. *Id.* at 60–61. Western Pacific Railroad sued to recover the monies owed in the Court of Claims. *Id.* at 61. The Supreme Court held that the interpretation of tariffs was a threshold issue to the overall claim, and that this issue was within the primary jurisdiction of the Interstate Commerce Commission. *Id.* at 63. Since this threshold issue was "within the special competence of an administrative body[,] in such a case[,] the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* at 64. "The doctrine of primary jurisdiction thus . . .

transfers from court to agency the power to determine some of the incidents" of the broader claim. *Id.* at 65 (internal quotation marks omitted).

Subsequent Supreme Court cases have consistently affirmed the doctrine of primary jurisdiction. In *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970), the Court held that "[w]hen there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged . . . with primary responsibility for . . . [the] activity involved." In *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 302 (1973), the Court held that the overall "action should be stayed until the administrative officials have had an opportunity to act . . . [when] some facets of the [overall] dispute . . . are within the statutory jurisdiction of the [Commission] and . . . adjudication of that dispute by the Commission promises to be of material aid in resolving" the overall claim. The *Ricci* Court elaborated that "[w]e make no claim that the Commission has authority to decide" the overall dispute, *id.* at 307, but "[w]e . . . think it very likely that a prior agency adjudication of this dispute will be a material aid," *id.* at 305, in either making the "problem disappear[] entirely" or making for "a more intelligent and sensitive [eventual judicial] judgment," *id.* at 307–08. And in *Reiter v. Cooper*, 507 U.S. 258 (1993), the Court held that

> primary jurisdiction . . . is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a "referral" to the agency . . . [and the court] has discretion . . . , if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice.

*Id.* at 268–69; s*ee also* 2 Richard J. Pierce, Jr., Administrative Law Treatise 1161 (5th ed. 2010) ("If a court concludes that it has . . . jurisdiction over a dispute but that an issue raised in the dispute . . . is within the primary jurisdiction of an agency, the court will defer any decision in the dispute before it until the agency has addressed the issue . . . .").

"No fixed formula exists for applying the doctrine of primary jurisdiction.  In every case the question is whether the reasons for the existence of the doctrine . . . will be aided by its application in the particular litigation."  *W. Pac.*, 352 U.S. at 64.  The two rationales for the doctrine are that "desirable uniformity . . . would [be] obtain[ed] if initially a specialized agency passed on certain types of administrative questions," and that "the expert and specialized knowledge of the agencies involved" would help ensure that "the limited functions of review by the judiciary are more rationally exercised." *Id.*  We conclude that the threshold question here of whether Wyandot Nation is a federally recognized Indian tribe is within the primary jurisdiction of Interior.  It is clear that "desirable uniformity" would be obtained by such an approach and that Interior has "expert and specialized knowledge" of the issue involved.

Other courts have reached similar conclusions, holding that whether a particular entity is an Indian tribe is to be first resolved by Interior.  In *James v. HHS*, 824 F.2d 1132, 1137 (D.C. Cir. 1987), the Gay Head tribe, like the Wyandot Nation, asserted that it "was already federally recognized," and sought "a declaration ordering the Department of the Interior to add the Gay Head Tribe to the list of federally recognized tribes."  The District of Columbia Circuit held that "[i]n cases such as this, where Congress has delegated certain initial decisions to the Executive Branch," questions as to whether the Gay Head

tribe was federally recognized "should be made in the first instance by the Department of the Interior." *Id.*

The *James* court cited several reasons for requiring Interior, rather than courts, to make tribal recognition determinations. First, "Congress has specifically authorized . . . the regulatory scheme set up by the Secretary of the Interior . . . to determine which Indian groups exist as tribes. That purpose would be frustrated if the Judicial Branch made initial determinations of whether groups have been recognized previously." *Id.* Second, such an approach "allows the Department of the Interior the opportunity to apply its developed expertise in the area of tribal recognition," since it "employs experts in the fields of history, anthropology and genealogy, to aid in determining tribal recognition[,] . . . providing . . . expertise . . . [that] would most assuredly aid in judicial review should the parties be unsuccessful in resolving the matter." *Id.* at 1138. Finally, Interior had not "expressed a strong position or an unwillingness to reconsider the issue of [a tribe's] acknowledgement." *Id.* at 1139.

Again, recently, in *Mackinac Tribe v. Jewell*, 829 F.3d 754 (D.C. Cir. 2016), following *James*, the District of Columbia Circuit held that

> when a court is asked to decide whether a group claiming to be a currently recognized tribe is entitled to be treated as such, the court should for prudential reasons refrain from deciding that question until the Department [of the Interior] has received and evaluated a petition under [25 C.F.R.] Part 83.

*Id.* at 757 (citations omitted).

In *Western Shoshone Business Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir. 1993), the Tenth Circuit endorsed and applied the *James* approach. There, Western Shoshone argued that a tribe may be not included on the

Interior list and yet still be recognized as an Indian tribe. The Tenth Circuit disagreed, explaining that

> the limited circumstances under which ad hoc judicial determinations of recognition were appropriate have been eclipsed by federal regulation. In 1978, the Department of Interior promulgated regulations establishing procedures for establishing that an American Indian group exists as an Indian tribe.  25 C.F.R. pt. 83. . . .  We therefore conclude that the *Tribe's absence from this list is dispositive.*

*Id.* at 1056–57 (emphasis added) (internal quotation marks omitted).

Again, in *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 546 (10th Cir. 2001), the Tenth Circuit reaffirmed this approach.  The United Tribe of Shawnee Indians ("UTSI") sought "a judicial ruling that it is a recognized tribe by virtue of . . . the 1854 Treaty and the decision in *The Kansas Indians*, 72 U.S. 737 (1866), which held that the Shawnee tribe existed as a recognized tribal entity in 1866."  The Tenth Circuit held that a tribe seeking recognition is required first to seek recognition at Interior, and not "attempt[] to bypass the regulatory framework for establishing that an Indian group exists as an Indian tribe. . . .  We were strongly persuaded in this matter by the decision in *James*."  *Id.* at 550 (citation omitted).

The Second Circuit has also reached the same result. In *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 55 (2d Cir. 1994), the Golden Hill tribe asserted that it was the rightful owner of 20 acres of land in Connecticut because that land had been wrongfully conveyed in violation of the Nonintercourse Act.  To show a violation of the Nonintercourse Act, a plaintiff must show that it is an Indian tribe.  The Second Circuit held that the fact

that Interior "lacks the authority to determine plaintiff's land claim," *id.* at 58, did not excuse the appellant from first seeking Interior recognition as an Indian tribe, *id.* at 60. "Primary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Id.* at 58–59. "The Department of the Interior's creation of a structured administrative process to acknowledge 'nonrecognized' Indian tribes using uniform criteria, and its experience and expertise in applying these standards, has now made deference to the primary jurisdiction of the agency appropriate" during the threshold determination of the broader land claim. *Id.* at 60.

The doctrine of primary jurisdiction has particular force in this area because of the long history making clear that tribal recognition is a political question committed to the political branches. "[I]t is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine . . . [i]f . . . Indians are recognized as a tribe." *United States v. Holliday*, 70 U.S. 407, 419 (1865); *see also United States v. Sandoval*, 231 U.S. 28, 47 (1913) (same); *United States v. Zepeda*, 792 F.3d 1103, 1114 (9th Cir. 2015) (holding that "federal recognition of a tribe [is] a political decision made solely by the federal government and expressed in authoritative administrative documents"); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1276 (9th Cir. 2004) ("[A] suit that sought to direct Congress to federally recognize an Indian tribe would be nonjusticiable as a political question."); *Miami Nation of Indians of Ind., Inc. v. Dep't of the Interior*, 255 F.3d 342, 347 (7th Cir. 2001) (Indian tribal "recognition lies at the heart of the doctrine of political questions." (internal quotation marks omitted)).

In *Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005), we addressed this issue in a different context.  Following *James*, we held that "[a]s a political determination, tribal recognition is not justiciable," *id.* at 1370, that "the courts had no judicially discoverable or manageable criteria by which to accord federal recognition," *id.* at 1372, and that "judicial evaluation of [tribal recognition] criteria [is precluded] in the first instance," *id.* at 1373.  The Interior regulations "create a limited role for judicial intervention, namely, APA review to ensure that the government followed its regulations and accorded due process.  Thus, under the acknowledgement regulations, the executive—not the courts—must make the recognition determination."  *Id.* at 1373 (citation omitted); *see also Miami Nation*, 255 F.3d at 348 (Interior regulations "bring[] the tribal recognition process within the scope of the Administrative Procedure Act . . . [which] require[s] agencies, on pain of being found to have acted arbitrarily and capriciously, to comply with their own regulations . . . and . . . to make compliance with the regulations judicially reviewable." (citations omitted)).

We agree with the concurrence that in this case, "absence from the list means absence of a right to an accounting, which in turn means no timely claim exists."  Conc. Op. at 2.  Such an analysis is precisely the result of the doctrine of primary jurisdiction, where courts could have jurisdiction over a broad dispute (i.e., claims for an accounting or monetary damages), but defer to an agency to decide a narrow predicate issue (i.e., here, the right to be on the List).

We hold that tribal recognition is within the primary jurisdiction of Interior and that we thus cannot independently make a determination of the effects of the various treaties or resolve the various conflicting legal and factual contentions about whether, apart from the Interior determination, Wyandot Nation is a federally

recognized Indian tribe. Under such circumstances, a court invoking the doctrine of primary jurisdiction has discretion to stay or dismiss the proceeding. *Reiter*, 507 U.S. at 268. Here, Wyandot Nation did administratively petition to be on the Interior list in 1996. After the agency made a "preliminary conclusion" that the Wyandot Nation was ineligible, the appellant did not seek further administrative action. S.A. 21. In light of the fact that Wyandot Nation has previously petitioned Interior on this exact issue and chose to abort the administrative proceeding, we conclude that dismissal of its Category One claims without prejudice is appropriate.

We note, however, that the administrative remedy is still available to Wyandot Nation, as the government agreed that the appellant may continue its petition to seek federal recognition until Interior has reached its "final decision." Oral Arg. 17:02–28. Furthermore, it is not disputed that judicial review in district court is available with respect to such a final decision once that remedy has been pursued. *Id.* Although the appellant may seek federal recognition, we do not address now what impact such recognition might have on the other claims in question here following such recognition if it occurred.

## II

Wyandot Nation asserts with respect to the Category Two claims that it is entitled to monetary damages from the United States for failure to collect, account for, and manage Huron Cemetery lands and its revenues generated from easements by Kansas City. We conclude that the doctrine of primary jurisdiction also applies to these claims.

Wyandot Nation argues that it has interest in the Huron Cemetery. There is no claim here that the individual members of Wyandot Nation have any interest in the cemetery. Nor could they. In *Conley v. Ballinger*, 216

U.S. 84 (1910), the Supreme Court held that "the right of the Wyandottes [over the Huron Cemetery] was in them only as a tribe." *Id.* at 90. Individual Wyandot Indians do not have any beneficial interests in the Huron Cemetery. *Id.*

Since *Conley*, the United States has claimed to hold the cemetery in trust for the tribe—specifically, the Wyandotte Nation of Oklahoma. "Huron Place Cemetery has been used as a burial ground for Wyandotte Indians for more than a century . . . . Since the incorporation of the Wyandottes of Oklahoma, the United States has dealt with them as the sole representative of the Wyandotte Indians" with respect to this interest. *City of Kansas City v. United States*, 192 F. Supp. 179, 181 (D. Kan. 1960). For example, in 1996, the appellant and the Wyandotte Nation of Oklahoma entered into a settlement agreement resolving the future use of the Huron Cemetery, which provided that "the United States claims to hold title to the Huron Cemetery in trust for the Oklahoma Wyandotte." J.A. 8. And in 2001, during a dispute over whether gaming activities could take place in tracts adjacent to the Huron Cemetery, the Tenth Circuit concluded that the Huron Cemetery was not a "reservation" for Indian Gaming Regulatory Act purposes, but referred to the Wyandotte Nation of Oklahoma as the beneficial interest holders of that land. *See Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1256, 1267 (10th Cir. 2001).

We need not decide whether these determinations are binding on the appellant. Wyandot Nation's claim to the Huron Cemetery is based entirely on its assertion that it is the successor of the Wyandot Tribe that had an interest in the cemetery. The basis for the appellant's argument is that because it is the successor-in-interest to the Treaty of 1855, which set aside the Huron Cemetery for the benefit of the Historic Wyandot Nation, it has a present-day property interest in the Huron Cemetery. Appellant's

claim thus is that it "is a federally recognized tribe that currently has an unextinguished, Fifth Amendment protected property interest in the Huron Cemetery." Appellant Br. 40. For the reasons discussed above, we conclude that the threshold issue of whether the appellant is in fact a federally recognized successor tribe to the Historic Wyandot Nation is within the primary jurisdiction of Interior, and that the Claims Court properly dismissed without prejudice. Again, we do not make a determination here as to what consequences federal recognition, if it occurred, would ultimately have on the appellant's Category Two claims.

## III

Having dismissed Wyandot Nation's claims on the ground of primary jurisdiction, we need not address the government's other arguments for affirming the dismissal.

## **AFFIRMED**

### COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**WYANDOT NATION OF KANSAS, AKA
WYANDOTTE TRIBE OF INDIANS,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-1654

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00560-TCW, Judge Thomas C. Wheeler.

---

O'MALLEY, *Circuit Judge*, concurring in the result.

I concur in the result the majority reaches—that the Court of Federal Claims judgment dismissing appellant's claim without prejudice should be affirmed. I do not concur in the legal rationale employed to reach that result, however. I do not think our analysis should be driven by the doctrine of primary jurisdiction.

The claims court did not rely on the doctrine of primary jurisdiction in dismissing appellant's complaint—it instead concluded that the tribe's absence from the list of all federally recognized tribes dictated by the Federally Recognized Indian Tribe List Act of 1994 ("List Act")

meant that the Wyandot Nation of Kansas was not eligible for an accounting under the American Indian Trust Fund Management Reform Act ("Reform Act"). Because only the right to an accounting under the Reform Act could restart the otherwise expired statute of limitations, the court concluded that the claims were time barred. In other words, absence from the list means absence of a right to an accounting, which in turn means no timely claim exists. I think the analysis we should employ is that straight-forward. As the majority concludes, "[t]he List Act regulatory scheme exclusively governs federal recognition of Indian tribes." Maj. Op. at 10.

It is not just the claims court who avoided resorting to the doctrine of primary jurisdiction; neither party argued for its application and neither briefed the question. While—as the majority points out—the government mentioned it as a possible alternative theory in a one-sentence footnote, in this circuit that is the equivalent of not raising the issue at all. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (noting that an argument is waived if made in only a passing reference with no developed argumentation and that "arguments raised in footnotes are not preserved").

Indeed, virtually every case upon which the majority relies to support its conclusion that the Wyandot Nation of Kansas's absence from the list prepared by the Secretary of the Interior pursuant to the List Act is fatal to their claims avoids reference to the doctrine of primary jurisdiction. *James v. HHS*, 824 F.2d 1132 (D.C. Cir. 1987), and *Mackinac Tribe v. Jewell*, 829 F.3d 754 (D.C. Cir. 2016), speak in terms of exhaustion, while *Western Shoshone Business Council v. Babbitt*, 1 F.3d 1052 (10th Cir. 1993), and *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543 (10th Cir. 2001), rely on concepts of standing and the inability of a tribe who is not on the list to state a claim for relief under the Reform Act. These

theories are closer to the mark in my view—particularly those articulated by the Tenth Circuit.

The one tribal case that does discuss the concept of primary jurisdiction is not to the contrary. The Second Circuit relied on the concept of primary jurisdiction in *Golden Hill*. *See Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51 (2d Cir. 1994). But: (1) that case did not involve the Reform Act, but instead was considering a cause of action under the Nonintercourse Act of 1790; (2) the case was decided before and without the benefit of the 1994 List Act; (3) the court concluded that it did have jurisdiction to declare the tribe before it eligible for relief under the Nonintercourse Act; (4) the court declined to do so, however, in deference to an already pending action before the Secretary of the Interior seeking such recognition; and (5) the court expressly declined to decide whether the doctrine of primary jurisdiction would require the same result in the absence of an already instituted administrative proceeding. Those facts are materially distinguishable from those before us. We are operating with the benefit and direction of the Reform Act and the List Act. Neither the claims court nor we have authority to give the appellant the relief it seeks because they cannot allege that they have a statutory prerequisite to that relief—inclusion on the list.

I view this case as the equivalent of someone who asserts a claim for patent infringement without first seeking and obtaining a patent from the Patent and Trademark Office ("PTO"). The court would have no authority to recognize a common law right to a patent. It is not that the PTO would have *primary* jurisdiction to issue a patent, it is the only entity with *any* authority to issue a patent. And the right to go to court claiming infringement is predicated on the PTO having first done so. If the party had failed to receive a patent from the PTO before filing its infringement suit, a court considering the action would have to dismiss the action for failure to state a

claim because the plaintiff could not demonstrate the underlying property right necessary to allege infringement of that right. Similarly, here, the court cannot provide the requested remedy because the Wyandot Nation of Kansas has not been recognized by the Secretary of the Interior and placed on the Secretary's list of federally-recognized tribes; the Wyandot Nation of Kansas, therefore, has failed to state a claim on which relief can be granted because it cannot demonstrate that it has met the conditions precedent to pursuing its claim. The statutory right to an accounting is tied to the Secretary of the Interior's list of federally recognized tribal entities and cannot be authorized for a tribe that is not on that list.

While I agree with the majority that reference to traditional notions of "exhaustion" does not really fit the circumstances here, neither do notions of primary jurisdiction.

I would affirm because the Wyandot Nation of Kansas has not asserted a claim upon which relief can be granted by the claims court.