FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| AGUA CALIENTE TRIBE OF CUPEÑO INDIANS OF THE PALA RESERVATION, *Plaintiff-Appellant*, <br><br> v. <br><br> TARA KATUK MAC LEAN SWEENEY[*], Assistant Secretary of Indian Affairs, United States Department of the Interior, *Defendants-Appellees.* | No. 17-16838 <br><br> D.C. No. 2:15-cv-02329-JAM-KJN <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted December 19, 2018
San Francisco, California

Filed August 7, 2019

---

[*] Tara Katuk Mac Lean Sweeney is substituted for her predecessor as Assistant Secretary of Indian Affairs, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Before:  Danny J. Boggs,** Richard A. Paez,
and John B. Owens, Circuit Judges.

Opinion by Judge Paez

---

**SUMMARY***

---

**Tribal Matters**

The panel affirmed the district court's order refusing to compel the Assistant Secretary of Indian Affairs to place the Aqua Caliente Tribe of Cupeño Indians on a list of federally recognized tribes published in the Federal Register.

The district court held that the Cupeño failed to exhaust the regulatory process codified at 25 C.F.R. § 83 (the Part 83 process).

The panel held that here, the Part 83 process, which is a formal administrative process for an Indian tribe to obtain federal recognition codified in the U.S. Department of the Interior's regulations, was the prescribed remedy. The panel further held that the Cupeño had made no attempt to exhaust that process. The panel rejected the Cupeño's contention that the Part 83 process did not apply here because the Cupeño sought "correction" of the list, not recognition. The panel also held that, while there were some doctrinal

---

** The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

exceptions to administrative exhaustion, they did not apply here. Finally, the panel agreed with the district court's determination that the Cupeño must exhaust administrative remedies, and until they did so, they were not entitled to the relief they sought in this lawsuit.

Concerning the Cupeño's equal protection and Administrative Procedure Act challenge, the panel agreed with the district court that the Department of the Interior had a rational basis for not making an exception to the Part 83 process for the Cupeño. The panel held that Interior's explanation for treating the Cupeño differently from the Ione Band of Miwok Indians, the Lower Lake Rancheria, and the Tejon Indian Tribe (who were all recognized outside of the Part 83 process), and requiring the Cupeño to adhere to the administrative process for federal recognition because many of the Cupeño were recently members of the Pala Band of Mission Indians, passed muster.

Finally, the panel held that the political question doctrine did not bar them from resolving the core issue in this case: whether the Cupeño can secure listing outside of the Part 83 process.

## COUNSEL

Andrew W. Twietmeyer (argued), Law Office of Andrew W. Twietmeyer, Los Angeles, California, for Plaintiff-Appellant.

Brian C. Toth (argued) and Mary Gabrielle Sprague, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment & Natural Resources Division, United States

Department of Justice, Washington, D.C.; James W. Porter Office of the Solicitor, Department of the Interior, Washington, D.C.; for Defendants-Appellees.

## OPINION

PAEZ, Circuit Judge:

The Agua Caliente Tribe of Cupeño Indians (the "Cupeño") argue that they are a federally recognized tribe, and, as such, the Assistant Secretary of Indian Affairs ("Assistant Secretary") within the Department of the Interior ("Interior") must place the tribe on a list of federally recognized tribes published in the Federal Register.[1]  The Cupeño sent a letter to the Assistant Secretary, requesting that they be listed as a federally recognized tribe.  When the Assistant Secretary denied their request, the Cupeño filed suit to compel such action.  Having jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 5 U.S.C. § 706, the district court refused to compel the listing of the Cupeño because they had failed to exhaust the administrative process.  The district court further concluded that the Assistant Secretary provided a rational explanation for refusing to make an exception to the administrative process for the Cupeño.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I.

Before reaching the merits, we provide some background on the Cupeño, their claims against Interior, and the relevant

---

[1] Hereafter, we refer to the Assistant Secretary, Interior, and the Bureau of Indian Affairs interchangeably.

regulatory process. We do not purport to provide a definitive history of the tribe; instead we summarize key parts of the record.

## A. The Cupeño

The Cupeño are an Indian group originally from a village at Warner's Hot Springs, California ("Warner's Ranch").[2]

In 1851, the United States negotiated a treaty at the San Louis Rey Mission with several Indian tribes, including the Cupeño. This treaty was never ratified. In 1865, the Office of Indian Affairs recommended that a reservation be made for the Cupeño near Warner's Ranch, and a separate reservation be made for the San Luis Indians at Pala (the "Pala," "Luiseño," or "Pala Luiseño," another tribe that was a party to the unratified treaty). Separate reservations were designated for the Pala Luiseño and the Cupeño by an executive order of President Ulysses S. Grant in 1875. Five years later, President Rutherford B. Hayes issued an executive order canceling the order that had granted a reservation for the Cupeño. Nevertheless, the Cupeño continued to live on the land near Warner's Ranch throughout the late 1800s.

Settlers later sought to quiet title to Warner's Ranch and succeeded in evicting the Cupeño living there. *See Barker v. Harvey*, 181 U.S. 481, 491 (1901). Soon after, Congress authorized the Secretary of the Interior to acquire land for the "Mission Indians" that had been residing at Warner's

---

[2] For consistency with our case law, we use the term "Indian" to refer to Native Americans. Additionally, although some historical records refer to the Cupeño as the "Agua Caliente" or "Warner's Ranch Indians," we use "the Cupeño" for internal consistency in this opinion.

Ranch.    The Secretary selected and purchased a tract adjacent to the Pala Luiseño where those Cupeño Indians could live.  These two tracts of reservation land are referred to as "Pala."[3]

The Cupeño and the Pala Luiseño did not integrate. Interior reports show that the "Warner Ranch faction," i.e. the Cupeño, demonstrated "no desire or intention to affiliate with the resident local Indians."  Census records show the U.S. government tracked the Cupeño separately (as the "Agua Caliente Tribe") in at least one year.

---

[3] The Cupeño maintain that the Cupeño and the Pala Luiseño have never resided on one reservation but instead reside on two adjacent reservations.  In a recent case, we favorably cited *Stand Up for California! v. United States Department of Interior*, 879 F.3d 1177 (D.C. Cir. 2018), *cert. denied sub nom. Stand Up for California! v. Dep't of the Interior*, 139 S. Ct. 786 (2019), to conclude that the Indian Reorganization Act's "expansive definition of 'tribe'" demonstrates that a group of Indians "'residing on one reservation' in 1934 . . . were in a 'tribe' pursuant to the [Reorganization Act]."  *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 596 (9th Cir. 2018).  Here, the parties submitted 28(j) letters concerning the *Cachil Dehe Band* and *Stand Up for California!* decisions.  Those cases, however, refer to the definition of tribe in the Reorganization Act, 25 U.S.C. § 5129, but the definition of tribe has some fluidity across federal statutes, *see Kahawaiolaa v. Norton*, 386 F.3d 1271, 1272 (9th Cir. 2004) ("[T]he United States has struggled to find an adequate definition of an Indian tribe.  There is no universally recognized legal definition of the phrase, and no single federal statute defining it for all purposes."); *see also* 25 C.F.R. § 83.1.  The resolution of whether there are one or two Pala Reservations does not affect the outcome of this appeal—and we do not resolve the issue here—because we need not resolve whether the Cupeño and the Pala Luiseño were two tribes or one pursuant to the Reorganization Act.  We refer to the two tracts of land as the tracts at "Pala" or the "Pala Reservation" not to suggest a conclusion, but for consistency with the record.

In 1934, Congress passed the Indian Reorganization Act ("Reorganization Act"), 48 Stat. 984 (1934), 25 U.S.C. §§ 5101–29, "which was intended in part to permit the tribes to set up legal structures designed to aid in self-government," *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 (9th Cir. 2004). The Reorganization Act authorized any tribe to organize and "adopt an appropriate constitution and bylaws" through a vote of the tribe's members and approval of the Secretary of the Interior. 25 U.S.C. § 5123(a). The Reorganization Act did not apply to any reservation where a majority of the adult Indians voted against its application "at a special election duly called by the Secretary of the Interior." *Id.* § 5125. Interior held a single election for the Indians residing on both tracts of the Pala Reservation—the Cupeño and the Luiseño. The Indians overwhelmingly rejected the Reorganization Act. While the Indians residing at Pala considered themselves distinct, Interior considered it "one reservation and no distinction [was] made between the lands acquired at different times." Some other federal government records from that period distinguish between the Cupeño and the Luiseño at Pala.

In 1959, the Indians at both tracts of Pala adopted Articles of Association to form one entity called the Pala Band of Mission Indians ("PBMI"). The PBMI included both the Cupeño and the Luiseño at Pala. Even though they had voted against the Reorganization Act, the PBMI submitted their Articles of Association to Interior, and Interior approved them.[4]

---

[4] The Cupeño suggest the groups organized this way in part because Interior urged them to and in part because it would help both the Cupeño and the Pala Luiseño benefit from a contract for the sale of sand and gravel. We do not determine the reasons that the Cupeño and the Luiseño

In 1979, for the first time, Interior published a list of federally acknowledged Indian tribes in the Federal Register, and the list included the "Pala Band of Luiseno Mission Indians, Pala Reservation, California."  Still, the federal government continued to acknowledge the distinct identities of the Cupeño and the Luiseño at Pala in some other contexts, such as in a Federal Register notice regarding an archaeological site, and in the 2010 census.

In the 1990s, the PBMI adopted a constitution, which Interior approved in 2000.  The PBMI Constitution maintained the same membership requirements as the Articles of Association.  One change from the Articles of Association to the PBMI Constitution allowed a six-member committee to amend or replace its existing enrollment ordinance with a new ordinance concerning membership and disenrollment. *See Aguayo v. Jewell*, 827 F.3d 1213, 1219 (9th Cir. 2016).  In 2011, the PBMI disenrolled approximately 150 members of Cupeño descent. *Id*. at 1220. Interior recommended against disenrollment but determined it could not intervene in the disenrollment decision and did not address the merits of the disenrollment decision.  *Id*. at 1220–21.  Sixty-five of the disenrolled members brought suit in federal court, and we heard the case on appeal.  *Id*. at 1221.  We recognized that "[t]ribal enrollment decisions are generally beyond the power of federal courts to review." *Id*. at 1222.  We agreed with Interior's hands-off approach, *id*. at 1221, noting that, "in the exercise of sovereignty and self-governance, tribes have the right, like other governments, to make good decisions, bad decisions, and decisions with which others may disagree," but that the federal government "does not interfere in those decisions in the absence of

---

came together to form the PBMI, nor could we do so on the record before us.

specific authority to do so," *id*. at 1229 (internal quotation omitted).

In August 2014, the Cupeño resolved to withdraw from the PBMI and established their own constitution.

In September 2014, the PBMI requested that Interior list it as the "Pala Band of Mission Indians of the Pala Reservation, California" on all subsequent lists—in effect, the PBMI asked Interior to omit the word "Luiseno" from the PBMI's name on the Federal Register list. The Federal Register list published in January 2016 reflected the requested change.[5] Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 81 Fed. Reg. 5019-02, 5022 (Jan. 19, 2016); *see also id.* at 5020 ("Amendments to the list include name changes and name corrections. To aid in identifying Tribal name changes and corrections, the Tribe's previously listed or former name is included in parentheses after the correct current Tribal name.").

## B. The Claims Against Interior

In December 2014, the Cupeño sent a letter to the Assistant Secretary for the Bureau of Indian Affairs enclosing the new Cupeño Constitution and asking Interior "to correct the 2015 list of federally-recognized Indian Tribes to reflect the independent sovereignty of the Agua Caliente Tribe of Cupeño Indians of the Pala Reservation."

---

[5] The Cupeño objected to the name change unless they were simultaneously added to the Federal Register list. *William J. Pink v. Acting Assistant Sec'y Indian Affairs*, 62 I.B.I.A. 250, 250, 2016 WL 3057938, at *1 (March 7, 2016). Interior's Board of Indian Appeals held that it lacked jurisdiction to review the name change. *Id*.

The Cupeño sent a second letter to the Assistant Secretary in June 2015. In this letter, the Cupeño argued that the PBMI is an "association of tribes" and "not a federally-recognized tribe in its own right," and that it was administrative error not to include the Cupeño on the Federal Register list. The Cupeño again asked Interior to "update the List of federally-recognized Indian tribes."

Having received no response to their letters, the Cupeño filed this suit in November 2015, seeking to compel the Assistant Secretary to respond to the request to correct or update the list.

In February 2016, the Assistant Secretary denied the Cupeño's request to be included on the recognized tribes list. In rejecting the request, the Assistant Secretary first noted a 2015 Policy Guidance that "directs any unrecognized group requesting that the Department [of the Interior] acknowledge it as an Indian tribe, through reaffirmation or any other alternative basis, to petition under 25 CFR part 83." Second, the Assistant Secretary stated that the Cupeño are distinct from other groups that have been "reaffirmed" outside of the regulatory process codified at 25 C.F.R. § 83 (the "Part 83" process), namely the Lower Lake Rancheria, the Ione Band of Miwok Indians, and the Tejon Tribe, because those groups established a pattern of dealings evidencing their long-standing and continuing governmental relationships with the United States. In particular, the fact that the Cupeño resolved to withdraw from the PBMI and dissociate from the Pala Luiseño is a "major distinction." The Assistant Secretary further explained that "the people now seeking Federal recognition as the Agua Caliente Tribe of the Cupeño Indians of the Pala Reservation are, or were until recently, members of the Pala Band of Mission Indians, a federally recognized tribe." The Assistant Secretary directed

the Cupeño "to exhaust administrative remedies by proceeding through the Part 83 process."

The Cupeño amended the complaint to seek an order reversing the Assistant Secretary's decision.

At a hearing on cross-motions for summary judgment, the district court granted the Assistant Secretary's motion and ruled that the court did not have jurisdiction to hear the case or to compel Interior to correct the federally recognized Indian tribe list to add the Cupeño. The district court recognized that Part 83 is a mandatory process, and the Cupeño had failed to exhaust it. The district court stated that, outside of the Part 83 process, any recognition of an Indian tribe is a political question. The district court further concluded that Interior provided a rational explanation for why it made exceptions to the Part 83 process for three tribes but not for the Cupeño because, until recently, the Cupeño had received the benefits and services of membership in another federally recognized tribe, and they could not show they were treated as a separately recognized tribe. This appeal followed.

## C.  Tribal Recognition and the Regulatory Process

Although tribes retain "inherent sovereign authority," *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014), "as far as the federal government is concerned, an American Indian tribe does not exist as a legal entity unless the federal government decides that it exists," *Kahawaiolaa*, 386 F.3d at 1273.[6]  When a tribe is federally recognized, it

---

[6] The tension between the sovereignty of tribes and the recognition power of the federal government is unsettling, especially in light of a history of violence against tribes. *See* Alva C. Mather, *Old Promises:*

confers a suite of federal protections.  25 C.F.R. § 83.2; *see also Kahawaiolaa*, 386 F.3d at 1273 ("Federal recognition affords important rights and protections to Indian tribes, including limited sovereign immunity, powers of self-government, the right to control the lands held in trust for them by the federal government, and the right to apply for a number of federal services."); *but see United States v. Washington*, 641 F.2d 1368, 1371 (9th Cir. 1981) (recognizing that nonrecognition of a tribe by the federal government "may result in loss of statutory benefits, but can have no impact on vested treaty rights").  Federal recognition is "a prerequisite" to an Indian tribe "possess[ing] a government-to-government relationship with the United States."  25 C.F.R. § 83.2(a).  Federal recognition is also referred to as federal acknowledgment.  *See* 25 C.F.R. § 83.1.

Historically, federal recognition could arise from treaty, executive order, or course of dealing.  *Kahawaiolaa*, 386 F.3d at 1273 (citing William C. Canby, Jr., *American Indian Law in a Nutshell* 4 (4th ed. 2004)).  In 1934, Congress passed the Reorganization Act, which had the "overriding purpose . . . to establish machinery whereby

---

*The Judiciary and the Future of Native American Federal Acknowledgment Litigation*, 151 U. Pa. L. Rev. 1827, 1829–30 (2003) (describing the, sometimes deadly, forced displacement of tribes from their homes by the federal government).  Our opinion should not be read as suggesting that non-federally recognized tribes do not exist or lack rich indigenous histories and cultures.  *See Kahawaiolaa*, 386 F.3d at 1273 n.1.  Nor do we comment on the separate recognition processes for internal-state government purposes that some states have adopted. *See Federal and State Recognized Tribes*, National Conference of State Legislatures, http://www.ncsl.org/research/state-tribal-institute/list-of-federal-and-state-recognized-tribes.aspx#State (last visited May 23, 2019).

Indian tribes would be able to assume a greater degree of self-government, both politically and economically," and formalized, to a degree, federal recognition. *Morton v. Mancari*, 417 U.S. 535, 542 (1974); *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 211 (D.C. Cir. 2013). The Reorganization Act authorized tribes to adopt governing documents through a vote of the tribe's members and Interior's approval but did not apply to reservations where a majority of adult members of the tribe voted against its application. 25 U.S.C. §§ 5123(a), 5125. "[N]inety-nine tribes were organized under the [Reorganization Act] and ninety-six Indian tribes were excluded. All of the tribes that organized became federally recognized tribes." Alva C. Mather, *Old Promises: The Judiciary and the Future of Native American Federal Acknowledgment Litigation*, 151 U. Pa. L. Rev. 1827, 1831 (2003).

Until the 1970s, federal recognition remained on a "case-by-case basis." *Kahawaiolaa*, 386 F.3d at 1273 (citations omitted). In 1975, "Congress established the American Indian Policy Review Commission to survey the current status of Native Americans. The Commission highlighted a number of inconsistencies in the Department of Interior tribal recognition process and special problems that existed with non-recognized tribes." *Id.* In 1978, Interior promulgated regulations establishing a uniform procedure for "acknowledging" American Indian Tribes. *Id.* (citing 25 C.F.R. § 83.1); *see also* 25 U.S.C. § 9 (delegating authority to the executive to "prescribe such regulations as [the President] may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for settlement of the accounts of Indian affairs"). When acknowledged, a tribe is added to the list of federally recognized tribes, which Interior has published annually in the Federal Register since 1979. 25 C.F.R. § 83.6(a); Indian

Tribal Entities That Have A Government-To-Government Relationship With The United States, 44 Fed. Reg. 7235 (Feb. 6, 1979). Pursuant to the acknowledgment regulations—the Part 83 process—other tribes may petition to be added to the list. 25 C.F.R. § 83.5.

Interior reviews a Part 83 petition for recognition to determine whether the tribe can meet a list of criteria: (a) the group has been identified from historical times to the present, on a substantially continuous basis, as Indian; (b) "a predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present"; (c) the group "has maintained political influence or other authority over its members as an autonomous entity from historical times until the present"; (d) the group has a governing document; (e) the group has lists of members demonstrating their descent from a tribe that existed historically; (f) most of the members are not members of any other acknowledged Indian tribe (with an exception for former members); (g) the group's status as a tribe is not precluded by congressional legislation. 25 C.F.R. § 83.11. A tribe that proves it was "previously acknowledged as a federally recognized tribe, or is a portion that evolved out of a previously federally recognized Indian tribe," need only establish (b) and either (a) or (c) from the list of criteria in section 83.11. 25 C.F.R. § 83.12. Staff historians and anthropologists at Interior conduct this review. *Kahawaiolaa*, 386 F.3d at 1274. "Thus, through its broad delegation and acknowledgment regulations, the Department of Interior has assumed much of the responsibility for determining which tribes have met the requirements to be acknowledged as a tribe with a government-to-government relationship with the United States." *Id*.

In 1994, Congress passed the Federally Recognized Indian Tribe List Act ("List Act"), Pub. L. No. 103–454, 108 Stat 4791 (1994).  The List Act requires Interior to publish annually "a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  25 U.S.C. § 5131.  In its findings, Congress stated that a tribe may become recognized through Congress, the Part 83 administrative process, or a decision of a United States court.  Pub. L. No. 103–454, § 103(3), 108 Stat 4791.  The Congressional findings for the List Act charge Interior with maintaining an "accurate, regularly updated, and regularly published" list, "since it is used by the various departments and agencies of the United States to determine the eligibility of certain groups to receive services from the United States." *Id*. § 103(6)–(8).

In 2015, Interior updated the Part 83 regulations, "revis[ing] regulations governing the process and criteria by which the Secretary acknowledges an Indian tribe."  Federal Acknowledgment of American Indian Tribes, 80 Fed. Reg. 37,862 (July 1, 2015) (codified at 25 C.F.R. pt. 83).  The 2015 revisions were the result of a notice-and-comment process that included meetings between Interior and federally recognized tribes, public meetings, and the submission of hundreds of written comments. *Id*. at 80 Fed. Reg. 37,864.  Interior acknowledged that the "process has been criticized as too slow (a petition can take decades to be decided), expensive, burdensome, inefficient, intrusive, less than transparent, and unpredictable." *Id*. at 80 Fed. Reg. 37,862.    With the 2015 revisions, Interior sought to streamline the process. *Id*. (noting, among other things, that the revisions should "allow[] for faster decisions [and] reduc[e] the documentary burden while maintaining the existing rigor of the process").  The revisions note, "[a]ny

petitioner who has not submitted a complete documented petition as of July 31, 2015 must proceed under these revised regulations."  25 C.F.R. § 83.7.

There are currently 573 federally recognized tribes. Indian Entities Recognized and Eligible To Receive Services from the United States Bureau of Indian Affairs, 84 Fed. Reg. 1200-01 (Feb. 1, 2019).  The two primary ways of obtaining recognition today are through a Congressional process or the Part 83 petition process.  *See* Kristen Matoy Carlson, *Congress, Tribal Recognition, and Legislative-Administrative Multiplicity*, 91 Ind. L.J. 955, 971–72 (2016).

## II.

The Cupeño seek an order compelling Interior to include the Cupeño on the federally recognized tribes list pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(2).  The Cupeño advance two theories of how this may be accomplished. First, the Cupeño argue that Interior has a duty to "correct" the list.  Under this theory, the Part 83 regulations do not apply.  Second, the Cupeño argue that the decision not to list the Cupeño without invoking the Part 83 process must be set aside as arbitrary and capricious.  The Cupeño point to three other tribes that Interior has added to the list outside of the Part 83 process and argue that there is no rational basis to treat the Cupeño differently.  We construe the first theory as one in the nature of mandamus, and the second theory as both an Administrative Procedures Act ("APA") and an equal protection claim.

Interior responds with a bevy of arguments for why we should not determine whether the Cupeño should be listed, including that (1) the Cupeño failed to exhaust administrative remedies, (2) the prudential doctrine of primary jurisdiction precludes review, (3) there is a rational

basis for distinguishing the Cupeño from the three other tribes, and (4) any request to correct the list is time-barred. Interior takes no position as to what it would conclude if the Cupeño were to file a Part 83 petition.  Recording of Oral Argument at 15:01–15:09, *Agua Caliente of the Cupeño v. Michael Black*, No. 17-16838 (9th Cir. Dec. 19, 2018).

We review de novo the district court's grant of summary judgment.  *Aguayo*, 827 F.3d at 1221.

## A.  Mandamus and Administrative Exhaustion

District courts have jurisdiction "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," pursuant to the Mandamus Act, 28 U.S.C. § 1361, and a similar provision of the APA, 5 U.S.C. § 706(1), which allows courts to compel "agency action unlawfully withheld or unreasonably delayed."  Here, we consider the two together "[b]ecause the relief sought is essentially the same."  *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997).  An order pursuant to § 1361 is available only if (1) the claim is clear and certain; (2) the official's or agency's "duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt"; and (3) no other adequate remedy is available.[7]  *Patel v. Reno*, 134 F.3d 929, 931 (9th Cir. 1997). Relatedly, the "well established" doctrine of administrative

---

[7] When examining a request for mandamus relief under the APA, we apply the six-factor test announced in *Telecommunications Research & Action Center v. F.C.C.*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) (the "*TRAC* factors"), which more closely examines timeliness and delay. *See Indep. Mining Co.*, 105 F.3d at 507 n.7.  The Cupeño have made no arguments regarding the *TRAC* factors, and because we conclude there is an available, unexhausted administrative remedy, we need not analyze the *TRAC* factors.

remedies "provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006) (quotations omitted).

As the source of Interior's nondiscretionary duty, the Cupeño point to the federal government's trust duty to Indian tribes, the Congressional findings that precede the List Act, and three other instances in which Interior has recognized a tribe outside of the Part 83 process. Assuming Interior has a duty to list the Cupeño, the Part 83 process provides an available, adequate remedy that the Cupeño have failed to exhaust.

Here, the Part 83 process, which is a formal administrative process for an Indian tribe to obtain federal recognition codified in Interior's regulations, is the prescribed remedy. A tribe seeking recognition—whether it has been previously recognized or not—may petition Interior. 25 C.F.R. §§ 83.3–83.5, 83.12. Once it receives the petition, Interior's Office of Federal Acknowledgement evaluates it and issues a proposed finding. *Id*. §§ 83.26, 83.28, 83.32. The tribe may respond, submit additional documents, and challenge the proposed finding before an Administrative Law Judge. *Id*. §§ 83.35, 83.37, 83.38. After the Administrative Law Judge issues a decision, the Assistant Secretary of Indian Affairs within Interior will begin review and, within 90 days of starting review, issue a final determination. *Id*. §§ 83.40, 83.42. The Assistant Secretary's final determination is a final agency action under the APA, which may be challenged in federal court. 5 U.S.C. § 704; 25 C.F.R. § 83.44.

The Cupeño have made no attempt to exhaust that process. Instead, the Cupeño argue that the Part 83 process does not apply here because the Cupeño seek "correction" of

the list, not recognition. Sending a letter to the Assistant Secretary exhausts the process for correcting the list, according to the Cupeño. While sending a letter is similar to the method by which the PBMI sought a tribal name change on the list, *see* 81 Fed. Reg. 5019-02 (Jan. 29, 2016), the Cupeño's construction of "correction" is novel and does not control. The Cupeño seek to add an additional indigenous entity to the list rather than correct an entity's name.

Framing the issue as one of "correction" is unsupported by the applicable regulations and case law. The idea of correcting the list seems to come in part from the congressional finding that "the Secretary of the Interior is charged with the responsibility of keeping a list of all federally recognized tribes" and "the list published by the Secretary should be accurate." Pub. L. No. 103–454, § 103(6), 108 Stat 4791. That finding need not be divorced from the Part 83 process that Interior designed to fulfill its list-keeping responsibility. *See* 25 C.F.R. § 83.2. Although somewhat circular, by definition, a federally recognized tribe is one that is already on the list. While the term "tribe" is subject to different definitions across statutes, *see Kahawaiolaa*, 386 F.3d at 1272, a "[f]ederally recognized Indian tribe" is "*an entity listed on the Department of the Interior's list* under the Federally Recognized Indian Tribe List Act of 1994, which the Secretary currently acknowledges as an Indian tribe and with which the United States maintains a government-to-government relationship." 25 C.F.R. § 83.1 (emphasis added); *see also Wyandot Nation of Kansas v. United States*, 858 F.3d 1392, 1398 (Fed. Cir. 2017) ("We are persuaded that the List Act regulatory scheme exclusively governs federal recognition of Indian tribes.").

Still, the Cupeño argue that they can bypass the Part 83 process because the tribe has long been federally recognized, and the tribe's relationship with the federal government has never lapsed or been severed.  As support, the Cupeño cite two letters from 2012 authored by the Assistant Secretary of Indian Affairs and regarding the Tejon Indian Tribe, which was added to the list outside of the Part 83 process.  In those letters, the Assistant Secretary wrote that the Part 83 acknowledgment process "does not apply to Indian tribes whose government-to-government relationship was never severed."   That statement no longer reflects Interior's interpretation of the Part 83 regulations, and it is inconsistent with Interior's operative Part 83 regulations.[8]

A plain reading of the Part 83 regulations makes no exceptions for tribes that establish an unsevered relationship with the federal government.   The Part 83 regulations announce, "[a]ny petitioner who has not submitted a complete documented petition as of July 31, 2015, must proceed under these revised regulations."    25 C.F.R. § 83.7(a).  A policy guidance published on July 1, 2015, confirms "[Interior's] intent to make determinations to acknowledge Federal Indian tribes within the contiguous 48 states *only* in accordance with the regulations established for that purpose at 25 CFR part 83."   Policy guidance, Requests for Administrative Acknowledgment of Federal Indian Tribes, 80 Fed. Reg. 37,538-02 (July 1, 2015) (emphasis added).

---

[8] Because this interpretation is not operative, requiring the Cupeño to go through the Part 83 process does not sever or in any way alter the relationship between the Cupeño and the federal government, as the Cupeño argue it will.

The Part 83 regulations recognize that petitioning tribes may be in different positions.  There are relaxed criteria for recognizing tribes that have been "previously acknowledged as a federally recognized tribe."  25 C.F.R. § 83.12; *see also Muwekma Ohlone Tribe*, 708 F.3d at 218.  Contrary to the Cupeño's suggestion, this section of the regulations is not limited to tribes whose relationship with the federal government has lapsed or terminated.  25 C.F.R. § 83.12. Instead, the regulations allow for evidence of past federal recognition—presumably evidence like the documentation that the Cupeño submitted in the summary judgment record here.  *Id.*  The regulations also address how "[a] splinter group, political faction, community or entity of any character that separates from the main body of a currently federally recognized Indian tribe"—like the Cupeño separating from the PBMI—can obtain recognition.  25 C.F.R. § 83.4(b). Such a group would have to "clearly demonstrate it has functioned from 1900 until the present as a politically autonomous community and meets § 83.11(f)," *id.*, where § 83.11(f) explains how a tribe whose membership is composed principally of persons who have formerly been enrolled in another tribe may still obtain recognition, *id.* § 83.11(f).

We also find guidance in other situations where tribes have sought recognition from courts, instead of pursuing the Part 83 process, without success.  For example, instead of filing a Part 83 petition, the Gay Head Tribe filed suit in federal court seeking "a declaration ordering [Interior] to add the Gay Head Tribe to the list of federally recognized tribes." *James v. U.S. Dep't of Health & Human Servs.*, 824 F.2d 1132, 1136–37 (D.C. Cir. 1987).  Much like the Cupeño's argument here, the Gay Head Tribe argued that it would be "redundant for them to exhaust administrative channels in an attempt to obtain federal recognition because the Gay Heads

have already been recognized." *Id*. at 1137. The D.C. Circuit was "unpersua[ded]" and required exhaustion of Interior's procedures. *Id*. The D.C. Circuit reasoned, "the determination whether [scholarly, government-commissioned] documents adequately support the conclusion that the Gay Heads were federally recognized in the middle of the nineteenth century, or whether other factors support federal recognition, should be made in the first instance by the Department of the Interior since Congress has specifically authorized the Executive Branch to prescribe regulations concerning Indian affairs and relations." *Id*. (citing 25 U.S.C. §§ 2, 9). The D.C. Circuit noted that Interior had expertise in the area of tribal recognition, including historians, anthropologists, and genealogical researchers on staff. *Id*. The purpose of the Part 83 regulatory scheme is for Interior "to determine which Indian groups exist as tribes" and that purpose "would be frustrated if the Judicial Branch made initial determinations of whether groups have been recognized previously or whether conditions for recognition currently exist." *James*, 824 F.2d at 1137.

Similarly, the Tenth Circuit has indicated that exhaustion is required when "a plaintiff attempts to bypass the regulatory framework for establishing that an Indian group exists as an Indian tribe." *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 550 (10th Cir. 2001) (citing *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1056–58 (10th Cir. 1993)). There, a Shawnee Indian group initiated the Part 83 process, but then abandoned it and sought a judicial declaration of federal recognition. *Id*. at 546. The Shawnee pointed to a treaty from 1854 and a judicial decision from 1866 recognizing it as a tribe. *Id*. at 546. The Tenth Circuit held that exhaustion of the Part 83 process was necessary because it is a matter of "specialized agency

expertise," and Congress "inten[ded] that recognized status be determined through the administrative process." *Id*. at 551. Moreover, "exhaustion 'may produce a useful record for subsequent judicial consideration, especially in a complex or technically factual context.'" *Id*. (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)); *see also Muwekma Ohlone Tribe*, 708 F.3d at 213 (acknowledging that the Muwekma sought recognition by letter, but when Interior directed Muwekma to submit a Part 83 petition instead, the tribe did so).

We agree with the reasoning of our sister circuits in *James* and *United Tribe of Shawnee Indians*. The factual record that could be developed at the administrative level would aid any future judicial review. *United Tribe of Shawnee Indians*, 253 F.3d at 551; *James*, 824 F.2d at 1138.

Finally, while there are some doctrinal exceptions to administrative exhaustion, they do not apply here. For example, one exception is if exhaustion would be futile because of certainty of an adverse decision. *James*, 824 F.2d at 1139. The Cupeño have not argued this, and the letter from the Assistant Secretary requiring the Cupeño to apply through Part 83 does not suggest futility.[9] Alternatively, the tribe may seek recourse in federal court if it is dissatisfied with the outcome of the administrative process. *Muwekma Ohlone Tribe*, 708 F.3d at 213; *see also* 25 C.F.R. § 83.44 (noting that the Assistant Secretary's final determination at the end of the Part 83 process is a final agency action for

---

[9] Indeed, at oral argument, Interior recognized that "there appears to have been a relationship" between the Cupeño and the federal government, and the Cupeño submitted evidence of it. Recording of Oral Argument at 22:48–23:07, *Agua Caliente of the Cupeño v. Michael Black*, No. 17-16838 (9th Cir. Dec. 19, 2018).

purposes of the APA).  Further, while the government has a "trust responsibility to Indians" to act in the interest of tribes, that responsibility does not require Interior to take a specific action beyond what statutes and regulations require.  *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006); *see also Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 574 (9th Cir. 1998).

The Part 83 process applies to the relief the Cupeño seek, and the Cupeño failed to exhaust the process.  We agree with the district court's determination that the Cupeño must exhaust administrative remedies, and until they do so, they are not entitled to the relief they seek in this lawsuit.

## B.  APA and Equal Protection

On three occasions since 1979, Interior has recognized tribes outside of the Part 83 process.  To treat the Cupeño differently from those three tribes, the Cupeño argue, is arbitrary and capricious and a violation of the Cupeño's equal protection rights.  Because the arguments are the same, we treat this as one claim.[10]     *Ursack, Inc. v. Sierra*

---

[10] The Cupeño brought this as an equal protection claim in the district court, but presented it on appeal as an APA claim that is dependent upon rational basis review—like an equal protection claim. Without exhaustion of administrative remedies, there is no final agency action for us to review.  Nonetheless, a rational basis review of an equal protection claim and an arbitrary and capricious review of an APA claim are similar.  *See Muwekma Ohlone Tribe*, 708 F.3d at 215 (discussing the two standards and claims together); *see also Nat'l Mining Assoc. v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017) (internal quotation marks omitted) ("The [arbitrary-and-capricious standard] is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."); *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an agency to

*Interagency Black Bear Grp.*, 639 F.3d 949, 955 (9th Cir. 2011) (treating the rational basis test for an equal protection violation as an analogue to the APA arbitrary and capricious standard).

To prevail on an equal protection claim, the plaintiff must show the government has treated it differently from a similarly situated party and the government's explanation for different treatment does not meet the relevant level of scrutiny. *Muwekma Ohlone Tribe*, 708 F.3d at 215. We have held, "the recognition of Indian tribes remains a political, rather than racial determination," and we therefore "appl[y] rational basis review."[11] *Kahawaiolaa*, 386 F.3d at 1279 (analyzing whether Interior's declaration that Part 83 precludes acknowledgment of Hawaiians is constitutional). Rational basis review is deferential and requires courts to uphold government actions "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id*. (quoting *Heller v. Doe,* 509 U.S. 312, 319–20 (1993)).

The three tribes that Interior has recognized outside of the Part 83 process are: the Ione Band of Miwok Indians (the "Ione"), the Lower Lake Rancheria, and the Tejon Indian Tribe (the "Tejon"). First, Interior "clarif[ied]" the status of the Ione and announced that the Ione would be included on the list in 1994. Prior to 1995, the United States did not set

---

treat like cases alike. If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases.").

[11] Discrimination on the basis of tribal membership or the recognition of a tribe is political, but "[g]overnment discrimination against Indians based on race or national origin" is subject to strict scrutiny. *Kahawaiolaa*, 387 F.3d at 1279.

aside land for the Ione, although it did attempt to purchase land for the Ione in the 1910s, the 1920s, and 1941, and announced an intention to hold land in trust for the Ione in 1972.

Second, Interior "reaffirm[ed] Federal recognition of Lower Lake in 2000." The United States had purchased land for the Lower Lake Rancheria in 1916, attempted to purchase additional land for the tribe in 1935, and granted an assignment of land to the Lower Lake Rancheria in 1947. At the same time that Interior records characterized the Lower Lake Rancheria as "terminated," Indian persons from the Lower Lake Rancheria lineal descent continued to assert their identity as a tribe and obtained funding from federal government agencies to research their tribal status and develop a tribal constitution, suggesting that the termination status was an error.

When adding the Lower Lake Rancheria to the list, the Assistant Secretary emphasized the "long-standing governmental relationship" of the Lower Lake Rancheria in contrast to "groups that had previously been acknowledged, but whose relationship with the Federal Government had not continued to exist [and who] were subject to the acknowledgment process." Thus, a tribe whose relationship with the United States was "continuous" might avoid Part 83, and one whose relationship had "lapsed" or "administratively terminated" needed to petition through Part 83. According to Interior, both the Ione and the Lower Lake Rancheria decisions "found some evidence of continuing Federal recognition in documentation of a relationship with the Federal Government near the time of the publication of the first list of federally recognized tribes in 1979."

Third, in 2011, the Assistant Secretary began to include the Tejon on the list.  In 1851, the Tejon and the United States entered into a treaty.  In 1873, a reservation was established by executive order for the Tejon and other bands of Indians.  Not all of the Tejon moved to the reservation, and the federal government continued to try to secure lands for the Tejon in three ways: by purchasing land (through the 1930s); through litigation (1920–24); and by securing public lands (in 1916).  In the 1960s and 1970s, Interior responded to U.S. Senate inquiries about the Tejon and explained that tribal members could remain on public lands for nominal rent.  Again, the Assistant Secretary explained the listing as a product of an ongoing government-to-government relationship that had never lapsed or been terminated.

Just as the Cupeño seek exception to the Part 83 process by analogy to those three tribes, so did the Muwekma.**[12]**  The Muwekma petitioned to be recognized and listed as a federally recognized tribe.  *Muwekma Ohlone Tribe*, 708 F.3d at 213.  Ultimately, Interior denied the petition.  *Id.*  The Muwekma then sued in federal court, where the "principal claim was that Interior denied Muwekma equal protection by requiring Muwekma to proceed under the Part 83 process despite summarily recognizing two other Indian tribes—the Ione [] and the Lower Lake Rancheria []—outside the Part 83 process."  *Id.* at 214; *see also id.* at 215 (noting that this claim was brought as an equal protection and an APA claim).  At the outset of the litigation, the district court required Interior to supplement the record with a detailed explanation of why it did not waive the Part 83 process for the Muwekma.  *Id.*  After Interior provided that explanation, the

---

**[12]** The Muwekma case preceded the listing of the Tejon, so their equal protection claim was based only on comparisons to the Ione and the Lower Lake Rancheria.

district court granted summary judgment for Interior, *id*. at 215, and the D.C. Circuit affirmed, *id*. at 223.  The courts recognized that the Ione and the Lower Lake Rancheria "had multiple post-1927 government-to-government interactions with the United States," whereas the Muwekma did not.  *Id*. at 216.  Applying rational basis review, the D.C. Circuit held that Interior had "adequately explained why Muwekma is not similarly situated to Ione or Lower Lake," and therefore the Muwekma's equal protection claim failed.  *Id*. at 217.

In the present case, the Assistant Secretary explained the differential treatment of the Cupeño from the Ione, the Lower Lake Rancheria, and the Tejon as follows: (1) "In each of those reaffirmations, the group established 'a pattern of dealing with the [group] which evidences [its] long-standing and continuing governmental relationship with the United States'"; and, (2) the "major distinction" that "the people now seeking Federal recognition as the Agua Caliente Tribe of the Cupeño Indians of the Pala Reservation are, or were until recently, members of the Pala Band of Mission Indians, a federally recognized tribe," whereas none of the other reaffirmed tribes claimed to be withdrawing or dissociating from a federally recognized tribe.

The first "pattern of dealing" distinction is not elaborated upon in the Assistant Secretary's letter.  The Cupeño highlight that they, too, had early treaty and land negotiations with the United States, and have continued to be denoted separately in census and archaeological records. This is not, however, the Assistant Secretary's only explanation for the differential treatment.

The second "withdrawing or dissociating from a federal recognized tribe" distinction satisfies rational basis review. The Ione, the Lower Lake Rancheria, and the Tejon had not in any way separated from a federally recognized tribe.  The

Cupeño, in contrast, did have a recent association with the PBMI.   In a 2014 resolution, the Cupeño "immediately withdr[e]w from the Association known as the Pala Band of Mission Indians and the constitutional entity known as the Pala Band of Mission Indians, Pala Band of Luiseño Mission Indians of the Pala Reservation, California."  The Cupeño's reply brief concedes this distinction from the Ione, the Lower Lake Rancheria, and the Tejon, stating that between the publication of the first list in 1979 and the PBMI's recent disenrollment decisions, "the Cupeño enjoyed the benefits of an active federal relationship that Ione, Lower Lake, and Tejon did not enjoy during their own periods of absence from the List."[13]

There are specific Part 83 regulations for previously recognized tribes, 25 C.F.R. § 83.12, and for a tribe that is "[a] splinter group, political faction, community, or entity of any character that separates from the main body of a currently federally recognized Indian tribe," *id*. § 83.4(b); *see also id*. § 83.11(f).   The word "splinter" may be misleading or carry unfortunate negative connotations, especially if, as the record suggests, two historically distinct tribal entities had been recognized as one, the PBMI. Additional language in the regulation about the *perceptions* of a tribe's associations with a federally recognized Indian tribe is particularly poignant here.   The section 83.11(f) regulations are for separated groups that "some have regarded . . . as part of or associated in some manner with a federally recognized Indian tribe."   *Id*. § 83.4(b).   This

---

[13] At oral argument, the Cupeño clarified that their membership includes individuals who were not disenrolled from the PBMI or who were never members of the PBMI.  This does not affect our analysis, and the point could be developed in the Part 83 administrative process. 25 C.F.R. § 83.11(b), (f).

highlights the tension between federal recognition—which must be determined by the federal government—and inherent tribal sovereignty. Nonetheless, it is rational for Interior to ask the Cupeño to demonstrate through the Part 83 process how they are a "distinct community" from the PBMI and "politically autonomous" so that Interior may make that federal-recognition determination. *Id*. § 83.11(b), (f).

Moreover, it is not inconsistent for Interior to change the name of the PBMI in the Federal Register upon written request. The PBMI has been federally recognized since 1979. While the Secretary of Interior had approved the PBMI Constitution, which identified the tribe as the "Pala Band of Mission Indians," decades earlier, it listed them as the "Pala Band of Luiseno Mission Indians" in the Federal Register. Not requiring a recognized and listed tribe to pursue a formal regulatory process for a name change—to what its name already was in the Secretary-approved tribal constitution—does not make Interior's present requirement that the Cupeño follow the regulatory process irrational.[14]

Interior's explanation for treating the Cupeño differently from the Ione, the Lower Lake Rancheria, and the Tejon, and

---

[14] The Cupeño make much of the PBMI being called a "band" rather than a "tribe" in its governing documents, in addition to attacking the PBMI's federal recognition. The validity of the PBMI's status is not a question before us. Moreover, Part 83 regulations define tribe as "any Indian tribe, band, nation, pueblo, village or community." 25 C.F.R. § 83.1. Certainly, the words may have different meanings and various indigenous entities may identify differently. Whether a group is a "band" or a "tribe" does not determine federal recognition. The Cupeño's arguments about historical distinctions between the Cupeño, the Luiseño, and the PBMI can be considered by Interior during the Part 83 process. *Id*. § 83.11.

requiring the Cupeño to adhere to the administrative process for federal recognition because many of the Cupeño were recently members of the PBMI, passes muster. We agree with the district court that Interior had a rational basis for not making an exception to the Part 83 process for the Cupeño.

## III.

Although the political-question doctrine was cited by the district court in its oral ruling, the Assistant Secretary does not argue that it applies. The political-question doctrine does not bar us from resolving the core issue in this case: whether the Cupeño can secure listing outside of the Part 83 process. *See Kahawaiolaa*, 386 F.3d at 1276 (recognizing that where the executive branch had created regulations for the tribal-recognition process, Interior's decisions about recognition and the regulations are subject to normal judicial review).

## IV.

The record in this case depicts some of the difficult historic relations between the United States and Indian tribes—the Cupeño were evicted from their indigenous lands and relocated, by the federal government, to reside next to another indigenous group despite potential conflict between the two. At present, however, the federal government has an administrative process by which tribes may petition for and receive federal recognition. Where the Cupeño have not pursued that process, and Interior has rationally distinguished the Cupeño from the other tribes that were listed outside of that process, we cannot order Interior to add the Cupeño to the list of federally recognized tribes published in the Federal Register. We affirm the district court's order granting summary judgment for Interior.

**AFFIRMED.**